JUDGE LINDSAY
delivered the opinion oe the court, Chiee Justice Peters and Judge Pryor concurring and Judge Coder dissenting.
The deed executed and delivered by the Louisville & Lexington and the Louisville & Frankfort Railroad Companies to Norvin Green was intended to secure the payment of bonds issued by said companies pursuant to legislative authority amounting in the aggregate to $3,000,000.
Subsequent to the execution of this deed the two companies were by act of the general assembly consolidated into one, to be known and designated as the “Louisville, Cincinnati & Lexington Railroad Company.” This corporation executed the deed to Douglass to secure the payment of bonds amounting in'the aggregate to $1,000,000. The two deeds, which we will hereafter term mortgages, covered the same property, which was made up of the railroads running from Louisville to Lexington, and from Lagrange to Newport, and all other property, rights, and franchises held or owned by the two old companies, and by their successor, the “Louisville, Cincinnati & Lexington Railroad Company.”
The bonds issued and sold under the mortgage to Green were to run thirty years from the 1st day of January, 1867. *614 They bear interest at the rate of seven per centum per annum, payable semi-annually.
Those issued under the mortgage to Douglass were to run thirty years from the 1st day of April, 1870. They bear interest at the rate of eight per centum per annum, payable semi-annually.
In the first named mortgage it is provided, in the event the mortgagors shall fail to pay any part of any installment of interest, that may fall due on the bonds it was intended to secure, for more than sixty days after such installment shall become due and be demanded, that upon the request in writing of any person holding any of such bonds the trustee, or his successor, may enter and take possession of the mortgaged property, and hold, use, and operate it for the benefit of the holders of the bonds; and further, that after such default and request, and possession taken, the trustee, or his successor, may, upon the written request of the legal holders of $500,000 of the bonds, sell the trust property to the highest bidder; “and said sale may be made for the whole amount of the principal and interest then accrued upon the whole issue of said bonds, treating the principal as become due by reason of the default in the payment of the interest.”
The mortgage to Douglass provides that upon the non-payment of any installment of interest, that may fall due upon the bonds it was intended to secure, for ninety days after it shall become due and be demanded, then the principal of all the bonds shall become due and payable, and the mortgage lien may at once be enforced for the entire amount of the bonds; and further, that in case of such default the trustee, upon the written request of the holders of a majority of the bonds, may take possession of the property, and by himself and agents, or by the receiver of a court, use and operate the same and receive the earnings and income therefrom, or said trustee in such case may, by the decree or judgment of a court having jurisdiction, have all the mortgaged property sold and conveyed.
*615 The company made default in the payment of the installment of interest falling due on the bonds issued under the mortgage to Green on the 1st of January, 1874, and in the payment of the installment of interest on the bonds issued under the mortgage to Douglass falling due on the 1st day of April, 1874.
Douglass, in the exercise of his contract right to have the mortgaged property sold by the decree, of a court of competent jurisdiction for the payment in full of the principal and accrued interest of all the bonds issued under the mortgage to him, on the 2oth of July, 1874, instituted his action in equity in the Louisville Chancery Court, and sought that relief. He made the railroad company and the senior mortgagee, Green, and other persons supposed to be interested in the mortgaged property, parties defendant to his action. He asked that the said property be sold and the proceeds distributed according to the rights of all the parties in interest, and in the meantime that it be placed in the hands of a receiver, and the earnings applied as the court might order.
Green answered, and made his answer a cross - petition against the railroad company, and joined with Douglas's in the prayer for the sale of the property and the appointment of the receiver.
After answer by the company, the court on the 19th of September, 1874, made the order for a receiver, and on the 21st of that month he was duly qualified, and at once assumed the possession of and commenced to operate the company’s roads.
On the 3d of the following month Cline and others, professing to represent large numbers of mechanics, artisans, laborers, workmen, engineers, firemen, conductors, brakemen, clerks, agents, and officers, who, they alleged, had been in the employ of the railroad company, presented their petition, and, upon their own motion, were made parties to the action. Two days thereafter Douglass amended his petition and made them *616 parties defendant. Thereupon they “ moved the court that the order, heretofore made for the receiver, be extended to enforce the payment of the back pay ” claimed to be due and owing to said employees. The petition of Cline, &c., was, by an amendment, made a cross-petition against Green, Douglass, and others. It was alleged in said petition that the company owed the persons whom he and his co-petitioners represented large sums of money for work and labor done and performed in operating, constructing, and repairing its roads subsequent to the 1st day of January, 1874, and prior to the appointment of the receiver. They filed with their pleadings a copy of the payrolls of the company, which they said set out in detail the nature of their several employments, the wages agreed to be paid them, and the balances due and in arrear to each person respectively. They claimed a lien upon the roads of the company, and upon their earnings, and asked that the receiver be required to satisfy their demands, out of the first net earnings that should come to. his hands. The company admitted the justice of their claims and the correctness of the amounts set out.
The appellants Douglass and Green, not objecting to the form of appellees’ action, nor to the sufficiency of-their petition, and not controverting the accuracy of the pay-rolls filed with it, replied to their cross-petition, and denied merely the existence of their asserted lien.
The appellant Patterson averred want of knowledge or information sufficient to enable him to form a belief as to the existence of the alleged claims. Two months before he answered, the pay-rolls upon which appellees based their proceeding had been made part of the record of the cause, and the company, the common debtor, had admitted the accuracy of these rolls. The means of information were thus placed within his reach, and as the payment of these claims will affect him only to the extent of diminishing a -fund to which he is *617 asserting title, lie could not be allowed to put the appellants upon the proof of their debts by a technical denial based upon a want of information palpably within his reach.
It is apparent, from the manner in which this branch of the cause was prepared, that the existence of the claims of the appellees was not intended to be denied, and for the purposes of this appeal we will regard their existence as tacitly admitted by all the parties interested.
June 18, 1875, the vice-chancellor held that appellees were entitled to the relief asked, and directed the receiver to prepare “a register or statement of the names of the several classes of employees, with the amount due each, and in general the character of their employment.”
The exceptions of appellants to the receiver’s report were properly overruled. He was a proper person to make up the required registry. The claims of Cline and others, as we have already seen, were not controverted, and it was not necessary therefore that his report should be susipined by proof. The registry was made up from exhibits on file in the cause, and it was not important that appellants should have had notice of the times and places he selected to discharge the duty imposed upon him in this regard.
On the 23d of July, 1875, the vice-chancellor made the final order directing the receiver to pay to the persons represented by the appellees, out of the net earnings of the road then in his hands, the several amounts shown to be due them respectively by the registry or statement reported. Said amounts aggregated the sum of $134,481.
To reverse this order Douglass and Green, as trustees, and James Patterson, in his own right and as the representative of other bondholders, prosecute this appeal.
It is not attempted in either of the mortgages under which appellants claim title to the earnings of the trust-property in the hands of the court’s receiver, to give the beneficiaries *618 thereunder a specific lien upon the earnings of the road while held and operated by the mortgagor.
The mortgage to Green provides that after default, as herein before set out, he or his successor may secure, for the benefit of the bondholders, the profits arising from the use of the company’s roads by taking possession and by holding, using, and operating them himself.
So the mortgage to Douglass provides that he, by himself or agent, or by the receiver of a court, may take possession of and use and operate said roads, and receive the earnings and incomes therefrom.
Green demanded possession of the mortgaged property, but, his demand not being acceded to by the company, he declined, or at least failed to take steps to enforce it, and, as already stated, has joined with Douglass in seeking a sale of the roads and the other property covered by the mortgages.
Douglass did not at any time attempt to secure the earnings and incomes of^the roads by taking possession of and operating them, by himself or agent, or by a receiver of a court, for whose acts the beneficiaries under his mortgage would be responsible.
He elected to pursue and enforce his alternative right of having the mortgaged property sold and conveyed by the judgment of a court of competent jurisdiction, and the receiver he asked for pending the litigation is not his special contract receiver, but such as courts of equity always appoint when a proper case is made out by a mortgagee in an action to foreclose or enforce his mortgage, and subject the mortgaged property to the payment of his debt.
Neither of these appellants having deemed it proper to secure the right to appropriate the incomes and earnings of the roads, in the mode provided for by his contract with the company, we will proceed to determine whether they can assert, as against these appellees, an absolute lien upon such *619 incomes and earnings in the hands of the receiver of the chancery court.
In the case of Ellis v. Boston, Hartford & Erie Railroad Company (107 Mass. Reports, page 1) a similar question was considered and determined. The deed of trust provided “that in ease default be made by said company in payment of any moneys, either principal or interest secured hereby (the default continuing six months), the said company shall, on demand of the trustees or trustee for the time being, or his or their agents, authorized thereto in writing, deliver to said trustees or trustee, or his or their agent, the actual possession of all the herein granted premises; and thereupon the said parties of the second part shall and may, by themselves, their officers, agents, and employees, take, receive, and operate the said railroad, franchises, and other property and estate hereby conveyed, and collect, receive, and have the rents, income, and profits thereof as fully as the party of the first part could do if no default had been made.”
If the trustees should, upon default, take the possession indicated, it was made their duty to give due notice thereof, and of their intention to foreclose the mortgage, by written notices filed with the secretaries of state of the states of Massachusetts, Rhode Island, Connecticut, and New York.
In a contest between the trustees and beneficiaries under this mortgage and a creditor of the railroad company, as to their respective claims to a fund made up of the earnings and incomes of the mortgaged property while in the hands of a provisional receiver appointed pending a suit for foreclosure, the court held that “ the terms of the mortgage being thus explicit in regard to the mode in which the trustees may reach and control the use of the corporate property and franchises and appropriate the income thereof, we do not think that any lien or priority of claim upon the income of the road can be acquired in any other mode.” And the unsecured creditor was *620 preferred to the trustees and the beneficiaries under the mortgage. It was left an open question as to whether, if the trustees had asked to have the mortgaged property sold for the payment of the mortgage debts, the income from the time the receiver took possession would have been treated as incident to and part of the fund distributable to the mortgagees or bondholders. The object of the suit being a strict foreclosure, the court was of opinion that question did not arise.
But it is to be observed that in that case provision wras made for the payment by the receiver of back pay due to the laborers and officers of the railroad company, and that the propriety of such provision and the right of the chancellor to make it was not even called in question by the eminent counsel representing the trustees and bondholders.
The rule prevailing in this state anterior to the adoption of the Civil Code of Practice was in accord with the general doctrine of that case. Then the mortgagee had the right, after condition broken, to sue in ejectment and recover possession of the mortgaged premises.
Speaking of his right to rents and profits in advance of a foreclosure, this court in the case of Castleman v. Belt (2 B. Monroe, 157) said: “Whether the mortgagor be in possession personally or representatively, the appropriate remedy of the mortgagee for obtaining a legal right to the profits is by eviction or entry or other notice of his claim thereto, or by express contract therefor. Until such entry or demand, or eviction actual or virtual, the law will not imply an assumpsit to pay him for use and occupation, either by the mortgagor or the mortgagor’s subsequent tenant, who had expressly agreed to pay rent to his lessor.”
But since the change in our rules of civil procedure, which allows equitable defenses to be interposed in actions at law, it has been almost universally conceded that the mortgagee in a strict mortgage can not, without the consent, express or im *621 plied, of the mortgagor, recover possession of the mortgaged premises in an action at law. A defense in the nature of a bill for redemption enables the mortgagor to compel a transfer of the cause to the equity side of the docket, where the mortgagee can demand only such relief as a court of equity will afford. Hence mortgages are now treated in this state as mere securities; and although, strictly speaking, the mortgagee is invested with the legal title, he holds it only in pledge, and the mortgagor is considered, both at law and in equity, the real owner of the property.
Being unable now to secure the rents, either by eviction, entry, or notice (Huston, Johnson & Co. v. Strow, MS. Opinion, Peters, Judge, January term, 1876), the mortgagee can demand them as a legal right only, in virtue of an express contract; and this he must do in the mode and manner provided by such contract.
Green might have had specific execution and might have compelled the railroad company to surrender to him or his agent the possession of the mortgaged property, if he had chosen to follow’ up his demand; and there were no intervening rights of prior encumbrancers interfering with his claim to possession. (Shepley v. Atlantic & St. Lawrence R. Co., 55 Maine, 406; Shaw, &c., trustees v. Norfolk County R. Co., 5 Gray, 162.)
If there were such intervening rights (and it is now insisted there were), his express contract with regard to the incomes and earnings is of no value because non-enforceable, and his attitude is that of an ordinary mortgagee, his rights being no greater than they would have been if the express contract had been omitted from his mortgage.
Douglass and those he represents are in the same condition with Green. The express contracts heretofore considered not having been made available because they can not be enforced, or because the mortgagees did not see proper to enforce them, *622 appellants’ claim to a perfect and absolute lien on the incomes, and earnings of the roads in the hands of the receiver is left to rest alone upon the fact that they are mortgagees and hold the company’s title to the property in pledge to secure the payment of their debts.
A mortgagee who has no specific pledge of the rents and profits of the mortgaged premises can not claim them as a legal incident to or a legal right growing out of his mortgage. (Zeiter v. Bowman, 6 Barb. 133; Astor v. Turner, 11 Paige, 436; Howell v. Ripley, 10 Paige, 43.)
When his debt has become due and it appears that the mortgaged property is probably insufficient to discharge it, a court of equity, if applied to to foreclose his mortgage and sell the mortgaged property, will, in that action, appoint a receiver to secure the rents, profits, incomes, and earnings accruing after the date of the appointment, and will in that way secure to him a specific equitable claim to them to make good the anticipated deficiency. (Section 329 Civil Code of Practice.)
But the mortgagee has not the absolute right to demand that the chancellor shall thus assist him to acquire this equitable claim. The appointment of a receiver is a matter of sound legal discretion. It will be made by a court of equity in an action to foreclose a mortgage and sell the mortgaged property when a proper state of case is presented and the mortgagee can in good conscience ask that the final payment shall be anticipated for the purpose of enabling him to divert the rents, profits, and incomes from the hands of the mortgagor and have them held as additional security for the payment of the mortgage debt. That the power of the chancellor, through the instrumentality of a receiver, to deprive the mortgagor of the possession and enjoyment of his property, before a regular hearing, for the mere purpose of protecting the mortgagee against anticipated loss, is discretionary in its nature, is established by all the authorities. (High on Receivers, pp. 7 *623 and 8; Kerr's Bispham on Receivers, p. 3; Edwards on Receivers in Equity, p. 2, and authorities cited by these authors.)
Section 329 of the Civil Code of Practice, which provides that “a receiver may, in like manner, be appointed where it appears that the mortgaged property is in danger of being lost, removed, or materially injured, or that the condition of the mortgage has not been performed, and that the mortgaged property is probably insufficient to discharge the mortgage debt,” may be regarded as defining and regulating, and pos-, sibly enlarging the powers of courts of equity in this regard. But it does not deprive them of their ancient and indisputable right to consider the circumstances of the particular case in hand, and upon such consideration to grant or refuse this extraordinary relief, as it may or not be unconscientious for the mortgagee to ask it.
Substantially the statute is but a legislative declaration of a pre-existing equitable right. It affects, and to some degree extends or enlarges the remedy, but it can not be construed as enlarging the legal or contract rights of mortgagees, and as conferring upon them the absolute and unqualified right to require the chancellor, in either one of the contingencies provided for, to sequestrate for their exclusive benefit the rents, profits, and incomes of the mortgaged premises.
Such sequestration through the agency of a receiver is in effect an equitable ejectment. In considering this species of equitable relief Judge Pratt, of the Supreme Court of New York, in the case of the Syracuse City Bank v. Tallman (31 Barbour, 201), says: “ This relief, it will be readily seen from the conditions necessary to its enjoyment, does not grow directly out of the relations of the parties, or the stipulations contained in the mortgage, but out of equitable considerations alone. It is not a matter of strict right, but is addressed to the sound discretion of the court. When the mortgagor is insolvent, and fails to pay at the day appointed, and the mortgaged prem *624 ises are an inadequate security, as between the mortgagor and mortgagee, it might well be deemed within the equitable discretion of the court to allow the latter to intercept the rents and profits for his better protection from loss. And this simple case seems to me the utmost extent to which this relief has been granted by the courts, or to which it can be granted within any admitted principles of equity.”
In its general scope this opinion is supported by sound reasoning, and the doctrines announced constitute the true criterion by which the nature and extent of the claims of appellants to the funds in controversy must be tested. The prayer of appellants to have the incomes and earnings of the roads intercepted and distributed to them as part and parcel of the mortgaged estate can be granted only upon the idea that their superior equities entitle them to that relief. They can not demand it as a legal right. They can not therefore be heard to complain that in granting them equitable relief as to these incomes and earnings the chancellor has imposed conditions unless the conditions are in themselves unjust or unreasonable.
Douglass avers in his amended petition that the mortgaged property, subject as it is to prior mortgages, will not be sufficient to satisfy the debts due to the bondholders represented by .him.
Green averred a state of facts showing that the mortgaged property was in danger of being “materially injured,” and complained that the net earnings of the roads were not being applied to the payment of the interest accruing on the bonded debt of the company, and that its directory had “failed to pay even the ordinary employees and workmen upon its roads, and had so fallen behind in the money due them that the said force of hands xvhich were employed by them and wex’e necessary to the maintenance and preservation of the pi’operty of said company had from time to time become so dexnoralized and *625 mutinous as to resort to acts of violence against the property of said company and to endanger the lives of passengers and safety of freight being transported over said road.”
Douglass, in an affidavit read in opposition to the appointment of Wilder as receiver, stated substantially the same facts. Neither Green nor Patterson makes any pretense that the ultimate payment in full of the lien debts represented by them is at all doubtful. Douglass insists in this court that the mortgaged property is insufficient to insure the payment of the bonds held by the beneficiaries under his mortgage. There was no proof to that effect before the chancellor when he made the order for the receiver; but as the affidavit of Douglass considered by the court when determining who should be appointed to that place tends to establish that fact, we will, for the purposes of this opinion, act upon the assumption that the record now shows that said property is “probably insufficient” to pay said bonds in full.
We find it necessary, in acting upon that assumption, to consider whether the vice-chancellor abused his equitable discretion when he postponed the holders of these bonds until he could pay out of the fund to be raised by his receiver the wages due to the appellees. Appellants concede that if the chancery court had denied their motion for a receiver they would have been without remedy; but they insist that inasmuch as it was made to appear to the satisfaction of the chancellor that he ought to take possession of the mortgaged property, he was bound to do so unconditionally, and that he had no discretion as to the application of the fund thereafter to be made up of its incomes, profits, and earnings. They insist that they had the right, as matter of law, to have this fund applied to the extinguishment of the lien debts in the order of their priority. As we have already intimated, we are of opinion this claim can not be supported.
Appellants have the legal right to have the mortgaged *626 property sold and the proceeds applied to the payment of their debts. They have a perfect right in equity to have the property protected and preserved while they are prosecuting their actions to enforce their mortgages, and against the general unsecured creditors of the mortgagor they may possibly have the equitable right to have the fund raised by the receiver held for their security. But this last not being a legal or contract right, the chancellor is not bound to enforce it in any and all contingencies. He can in proper cases attach to its enjoyment reasonable conditions, and may do so either by the order appointing the receiver or by an order made subsequent to his appointment.
To decide that the chancellor does not possess this power would be to hold either that he must refuse to appoint a receiver in a case, in which to allow the sequestration for the benefit of the mortgagee of the rents, profits, and incomes of the mortgaged property would be unconscientious and iniquitous, or that he is bound by inexorable law in such a case to make himself an active party to an iniquitous transaction.
The right of the chancellor to modify an order appointing a receiver is distinctly recognized in the opinion of this court in the case of The Maysville & Lexington Railway Company v. Punnett (15 B. Monroe, 47). The power to modify or qualify such an order necessarily includes the power to make a qualified or conditional order in the first place. The legal effect of the order herein appealed from was to qualify the order for the receiver as originally entered. The chancellor had the undoubted power to make the qualification, and his action in the matter should not be reversed unless he has improperly exercised that power.
The claims of the appellees which the chancery court -directed to be paid were for work and labor done and performed for the railroad company after default had been made in the payment of the interest due under the mortgage to *627 Green. Much of it. was done after default in the payment of interest accruing under the mortgage to Douglass.
It is not denied — in fact, it may be said to be admitted— that the services of the appellees were devoted to constructing, repairing, and operating the mortgaged roads; that they were necessary for those purposes, and that they preserved the property, and enabled the debtor company to retain its good will and the public confidence — up to the time, at least, the workmen and laborers are alleged to have become demoralized by the continued non-payment of their wages.
Notwithstanding all these conceded facts, the appellants demand not only their legal and contract right to have the property thus constructed, repaired, and preserved, sold and the proceeds applied to the satisfaction of their bonds, but they insist that the chancellor shall, for their further security, hold the fund accumulated by his receiver, and refuse to apply any portion of it to the payment of these appellees for the services thus resulting to their direct and substantial advantage. They argue that the appellees should be treated as mere ordinary creditors of the railroad company, who extended credit to it with actual or constructive notice of the existence of their contract liens, and with implied knowledge of their legal right, after default by said company, to require the chancellor to take possession of its roads and to operate them pendente Me for their security and protection. They deny that the meritorious character of appellees’ claims is entitled to any consideration by the chancellor, and deny that he can provide for their payment until he has first secured to them the full and complete enjoyment of all their rights, legal and equitable.
These positions are clearly incompatible with the maxim that “ he who seeks equity must do equity.”
When appellants applied to the chancellor to be assisted to reach the incomes and earnings of the mortgaged roads,- they prudently sought to avoid all danger of individual responsi *628 bility to their debtor or to the public, by asking that they should be operated by the court.
In affording them this relief the chancellor found it necessary to exercise the delicate power of depriving the mortgage-debtor of the possession of its property and of sequestrating the incomes and earnings arising from the operation of its roads, in advance of a final judgment.
Of the right to control and dispose of the incomes and 'earnings of mortgaged property, the mortgagor can not and ought not to be deprived except at the instance and for the benefit of a party who has a legal or contract claim to them, or a clear right in equity to have them held for his security.
In this connection it is proper to consider the fact that there is a perceptible distinction between the character and nature of the net earnings realized by the operation of a line of railways and the ordinary rents and profits of lands and tenements.
The receiver of a line of railways is not the mere passive agent or officer of the court, charged with the simple duty of })reserving the property intrusted to his care and of collecting the rents and profits arising directly out of the thing mortgaged, and holding them until the rights of the litigants shall be determined. His duties comprise the management and operation of the roads. He, ex necessitate, becomes a common carrier, and in order to preserve the mortgaged property is compelled to discharge the duties of a quasi public corporation.
It is a fact, of which judicial notice may be taken, that a railway has but little rental value when, as in a case like this, the lease can not be made for a greater length of time than will probably be sufficient to enable the mortgagees to prepare their cause for trial and judgment and compel a sale of the Mortgaged property. Hence the net earnings of a railway in the hands of a receiver depend very greatly upon his experi *629 ence and skill as a railway operator and upon the energy and fidelity he may display in the discharge of his duties.
Now, whatever rights, legal or equitable, the mortgagee may have to the thing mortgaged, and to the rents and profits springing directly out of the thing itself, he certainly has no claim to or lien upon the experience, skill, energy, and fidelity of the court’s receiver, who represents the interest as well of the mortgagor as of his lien creditor. (Elliott v. The U. S. Insurance Co. 7 Gill’s Md. Reps. 319.) Such being the case, it is difficult to assign a reason why the chancellor may not assume in this case to exercise the discretionary power of applying so much at least of the net earnings of the mortgaged roads as is manifestly attributable to the superior skill and fidelity of his receiver to the payment of the wages due to these appellees for labor and services, performed, it is true, at the instance and request of the mortgagor, but for the direct benefit and advantage of the mortgagees.
Of course it is not possible to ascertain the extent to which the superior skill and energy of the court’s receiver contributed to increase the sum of the net earnings of the roads. The record discloses that under his management the road-beds, tracks, bridges, cars, engines, and other property of the company were put and have been kept in repair and the current expenses of operating the roads, including the wages of the officers and employees paid, and in a period of about nine months a surplus of net earnings amounting to over $180,000 accumulated.
When this result is compared with the result of the management of the same property by the railroad company, accepting as true the representations of appellants with regard to that matter, it is very difficult to show that any portion of the fund directly and solely attributable to the money-earning capacity of that property under ordinary management has been diverted from the payment of their bonds.
It is not strictly accurate to say that the appellees bear to *630 the mortgagees the same relation as that borne them by other general creditors of the insolvent company. The mortgagees accepted their securities with knowledge that the railroad company, though technically speaking a private corporation, was under obligations to the state' to render certain important public services. They knew that the railroads were in a certain sense public highways, and that whoever owned them or held them in pledge was bound to see that they were at all times so operated as to subserve the public convenience. The interest the public has in the construction and successful operation of lines of railway has influenced the courts to treat railroad mortgagees as possessing rights superior to those of beneficiaries under mortgages covering other kinds of property ; and courts of equity have not hesitated to interfere for their protection in cases in which other mortgagees would have been left to their remedy at law. (Phillips v. Winslow, &c. 18 B. Monroe, 431.)
In the case just cited the “great inconvenience to the public” likely to result from the acts, the commission of which was sought to be enjoined, was distinctly recognized as one of the grounds upon which the interference of the court below was approved.
The considerations leading to the adoption of this rule are not to be wholly overlooked when the public interests may require that the equitable rights of this class of mortgagees shall be subordinated to the claims of a class of persons who, by their labor, enabled the mortgagor to discharge its public duties.
It was through the labor and services of these appellees, performed and rendered after the railroad company had become notoriously unable to meet its indebtedness, and during a period when these appellants either could not or would not interfere to protect and preserve their mortgage security, that the company’s roads were operated and its duties to the public *631 discharged; and, as we have already seen, it was by this labor and these services that said mortgaged property during this period was preserved and kept in repair. It is plain, therefore, that the debts due to the appellees were contracted for labor which resulted in substantial advantage to the parties who are here insisting that their payment out of a fund to which said parties have no legal or contract claim, and which they can reach only through the intervention of the chancellor, is an abuse by that officer of his equitable discretion.
It was to the interest of the lienholders, and especially of those represented by Douglass, that the receiver should be enabled, pending the litigation, to operate the roads of the company successfully and profitably. To secure immediate success in this regard, it was desirable, if not indispensably necessary, that he should be enabled to retain in his service the force of employees he found in the service of the company when he took possession of its roads. One of the principal grounds of complaint urged against the management of the company by both Green and Douglass was the discontent, upon the part of the employees and laborers constituting this force, resulting from the non-payment of their wages. It was the duty of the chancellor to allay this discontent and to assist his receiver in securing the services of these people, and thus insure the profitable management and operation of the roads in his hands, if this could be accomplished by an act manifestly just, certainly within the scope of his judicial powers, and to which the appellants ought not, in good conscience and fair dealing, to object.
Nor will it necessarily follow from the affirmance of the order of the vice-chancellor that all the general creditors of the railroad company will be able to assert successfully their right to be paid out of the fund held by the receiver. Each claim will rest upon its own peculiar merits; and as the mortgagees have prima facie an equitable claim to the whole fund, *632 the onus will be upon each general creditor to establish a superior right upon his part.
The power of the vice-chancellor to extend the order appointing the receiver we do not think is open to serious question. That order was provisional, not final. Being temporary in its nature, it remained completely under the control of the court that made it. (15 B. Monroe, 48.)
While the vice-chancellor of the Louisville Chancery Court can not set aside, annul, or modify any action, finding, or decision of the chancellor, if the same be final in its nature, and can not annul or modify an interlocutory order made by the chancellor so long as the .cause is before the latter for adjudication, yet he may dispose of or determine any cause or any motion pending in any cause that may be assigned to or may come before him under the provisions of section 2 of the act of March 26, 1872. (Sess. Acts 1871 — 2, vol. 1, page 66.)
As the bill of exceptions filed on the 20th of July, 1875, shows that the appellants were then submitting without objection to the jurisdiction of the vice-chancellor, and as there is nothing to the contrary in the record, it is to be presumed that the motion to extend or modify the order appointing the receiver had been regularly assigned to the vice-chancellor to be by him heard and determined.
A careful and patient investigation of the questions of law and fact arising on this appeal has satisfied us that the appellants have no legal or equitable right to demand the reversal of the order or judgment appealed from. It must therefore be affirmed.