# CASES ARGUED AND DECIDED

IN THE

# Supreme Court of Georgia.

## OCTOBER TERM, 1894.

CENTRAL TRUST CO. OF NEW YORK *et al. v.* THURMAN *et al.*
ROUNTREE *v.* CENTRAL TRUST CO. OF NEW YORK *et al.*

1. The lien laws of Georgia are embodied in the code, together with statutes enacted since the adoption of the code. These liens and no others are contemplated by §§3149 *et seq.* of the code and the acts amendatory thereof, touching the distribution of the assets of an insolvent corporation or trader. The same rule as to the preservation of liens prevails in the case of railroad corporations as in the case of other corporations or of traders in general. If the equitable doctrine recognized by some courts, that there are preferential debts within a so-called six months rule, which will take priority over a mortgage upon a railroad, can be recognized in this State at all, it certainly cannot be when the proceeding is under the above cited sections of the code, and when the mortgagee does not intervene as a plaintiff but comes in to make defence only.

2. Where a railroad is operated by a receiver, all his legitimate expenses, including the fees of his counsel, are chargeable upon the fund produced by a sale of the railroad made under a decree rendered in the cause, if there is no other fund under the control of the court out of which these expenses can be paid. Income would be chargeable before corpus, but as a last resort the charge would fall on the latter.

3. Counsel fees in a proceeding under §§3149 *et seq.* of the code and the acts amendatory thereof, against an insolvent corporation, may be allowed for bringing the fund into court; but the scheme of the statute is that these fees, as a part of the expense of the litigation, shall be borne in some just proportion by all who come in to claim the fruits of the proceeding. No suitor can rightly take any of these fruits without bearing his due proportion of such fees; and even a voluntary party defendant who ultimately shares in the

fund which is realized, and takes it by the judgment or decree finally rendered, is chargeable the same as he would be had he intervened as a coplaintiff.

4. A receiver of a State court is not chargeable with expenses incurred by a receiver of the Federal court while the property was in the hands of the latter, or for the hire of property which the latter used on a contract of hire made by him.

5. The constitution puts damage done to·private property and the taking of it for public use on the same footing. Consequently, damage done to land by taking a portion of it for the way of a railroad ranks with the amount allowed for the right of way itself, in competition with a mortgage upon the railroad to secure other indebtedness of the company.

6. Where a statute, such as ⸹⸹3149(a) *et seq.* of the code, extends the equitable jurisdiction of the superior court to new cases, the mode of trial in such cases is governed by ordinary equity practice; and the trial of facts by master or auditor instead of by jury, is subject to the will of the legislature.

October 4, 1894.   Argued at the last term.   Justice LUMPKIN being disqualified, Judge JENKINS, of the Ocmulgee circuit, was designated to preside.

Equitable petition, etc.   Before JOHN L. HOPKINS, judge *pro hac vice.*   Fulton superior court.   September term, 1893.

HENRY B TOMPKINS, CHARLES Z. BLALOCK and WILLIAM B. FARLEY, for Central Trust Co. *et al.*   GLENN & MADDOX, for Rountree.   PAYNE & TYE, HENRY JACKSON, P. F. SMITH, GUSTIN, GUERRY & HALL, DORSEY, BREWSTER & HOWELL, HAMILTON DOUGLAS, A. W. SMITH, A. A. MEYER, C. W. SMITH, R. E. WRIGHT, W. W. GAINES, HARDEMAN, DAVIS & TURNER and HARRISON & PEEPLES, *contra.*

JENKINS, Judge.

It appears from the record in this case, that on January 13th, 1892, E. W. Marsh and others filed their equitable petition in Fulton superior court, against the Atlanta and Florida Railroad Company.   It was alleged in the petition, that the defendant was insolvent and unable to pay its debts, that petitioners were unsecured creditors, that since the maturity of the debts owing to petitioners respectively, payment had been demanded and

refused, that the indebtedness was contracted in the conduct of the defendant's legitimate business, etc.   Among other things, petitioner prayed the appointment of a receiver, with power to convert into money, under order of the court, all of the property of the defendant, and to disburse the same.   On February 9th, 1892, the Hon. MARSHALL J. CLARKE appointed T. W. Garrett temporary receiver, with full power and authority to take charge of the property of the defendant, consisting chiefly of its railway, and to manage and control same, under direction of the court, until further order.   On the same day R. H. Plant was also appointed receiver of the defendant's property, under a bill filed by other creditors in the United States circuit court for the southern district of Georgia.   A somewhat spirited controversy between the two receivers touching the possession of the defendant's property followed, which, on March 8th, 1892, was quieted by an order of Judge CLARKE directing Garrett, as receiver, to deliver to Plant the possession of the property; said order containing further direction to Garrett to set up title to the property by a petition addressed to the United States court, and to adopt and pursue such further legal proceeding as might be necessary to a final adjudication upon such title in the courts of the United States.   After much litigation, which reached the Circuit Court of Appeals, a decree was rendered in the Federal court restoring the property to the possession of Garrett, who, on June 17th, 1892, was, by order of Judge CLARKE, appointed permanent receiver of the defendant corporation and of all its assets of every kind and character.   He was authorized and directed to operate the railroad of the company and carry on its business as a common carrier, and, to that end, was authorized to make such contracts as might be necessary, to employ such agents, engage such counsel and retain or discharge such employees as might seem

v 94-47

to him necessary and proper. It is needless here to re-cite all the details of the litigation which followed.

On July 2d, 1892, the Central Trust Company of New York, alleging itself to be a trustee under a mortgage or deed of trust, made by the Atlanta and Florida Railroad Co., on the 1st day of November, 1889, for $840,000.00, with semi-annual interest payable on the 1st day of May and the 1st day of November of each year, was on its own petition made a party defendant. This mortgage was referred to in the original petition of Marsh and others, and a copy attached thereto. By reference to the terms of this mortgage, it will be seen that it created a lien in favor of the holders of the bonds of the company upon the entire property, rights and assets of the defendant. It was recorded December 5th, 1889. The purpose of the Central Trust Company in becoming a party defendant, as the record makes clear, was not to further the ends of the litigation in the State court, but to defeat the same entirely. By divers proceedings it sought to accomplish its purpose. It denied the necessity for the appointment of a receiver, asked that the order appointing him be annulled, sought to remove the litigation to the circuit court of the United States for the northern district of Georgia, etc.

On April 3d, 1893, on the intervention of Wm. A. Wright, comptroller-general for the State of Georgia, Garrett, the receiver, was, by order of the superior court, directed to sell, free from all liens, mortgages, deeds of trust, judgments and incumbrances of every character whatever, on the first Tuesday in May thereafter, the railway of the defendant company, together with its franchises, rolling-stock and other property. The order of sale fixed the minimum price at which the property might be sold at $500,000.00, of which sum $100,000.00 should be paid in cash and the remainder when the sale should be confirmed, with privilege to the bondholders

to pay the deferred sum of $400,000.00 in bonds of the company should they become the purchasers. In pursuance of this order the receiver sold the property of the company, at public outcry, to Adam Dutenhofer for the bondholders, at $500,000.00, receiving $100,000.00 in cash and remainder in bonds, which sale was reported to the court and which was duly confirmed.

Various creditors of the Atlanta and Florida Railroad Company, not hereinbefore named, by intervention before or after the sale, became parties plaintiff to the litigation. It appearing that there were conflicting claims to the fund in the hands of the receiver, and controversies as to the priorities of debts, on May the 24th, 1893, upon the petition of Houser and others, the cause was referred, by order of the court, to Wm. T. Moyers, as auditor, to take and hear evidence and report upon all matters of law and fact involved in the cause between the plaintiffs and defendants. He was also directed to report what would be reasonable compensation for the receiver, what would be reasonable compensation for the attorneys of the receiver for services and advice rendered him as such, what amount should be allowed complainants' solicitors who filed the petition under which the fund was brought into court; and to report what should be allowed the attorney of the Atlanta & Florida Railroad Co. for services rendered since the appointment of the receiver. On June 3d, 1893, Adam Dutenhofer, as chairman of the committee of bondholders, intervened, and was by order of the court made a party to the cause. He alleged that as such chairman he would be entitled to receive from the receiver whatever surplus might remain of the $100,000.00 paid on the purchase of the property, after paying claims made against the fund which should be adjudged prior in right to the lien of the mortgage before referred to. On June 17th, 1893, the auditor filed his report. From

this report it appears that the auditor found, among other things, that certain unsecured debts, contracted before the appointment of the receiver, were, under a so-called "six months rule," entitled to priority over the mortgage of the bondholders. In his report we find this language: "He [the auditor] concludes that the court clearly has authority, either at the appointment of the receiver or when distributing the fund, to direct payment of certain unsecured debts of the defendant in preference to mortgagee's claims, out of the fund realized from the sale of the property covered by mortgage. . . . The auditor concludes that claims entitled to such preference are those for labor, for necessary improvements and for such supplies and for such service of other railroads and expenses as were necessary to keep the road a 'going concern'; which claims must have originated in so short a time before the appointment of a receiver as to leave no doubt of their benefits accruing to the mortgagee." The several claims belonging to this class, adjudged by the auditor to be prior to the mortgage of the bondholders, aggregate quite a considerable sum; and to the allowance of priority the plaintiffs in error, the Central Trust Co. and Adam Dutenhofer, duly excepted. On October 28th, 1893, the judge presiding approved the report of the auditor, except as to a finding in favor of W. H. Horne, and dismissed all of the exceptions to the auditor's report, save the one referring to Horne's claim, and at a later date, November 1st, 1893, directed the jury to render a verdict sustaining and confirming and finding in favor of the auditor's report in all respects except as to the claim of Horne. The verdict, so rendered, was, on the last mentioned day, made the decree of the court. To the judgment of the court the Central Trust Co. and Adam Dutenhofer excepted and assign same as error.

1. One of the questions presented in the case is, did

the court err in holding, in effect, that unsecured debts of a certain class should be paid out of the fund arising from the sale of the mortgaged property in preference to the mortgage debt? Though of modern origin there can be no question that the doctrine of equitable preference given to unsecured debts, contracted before the appointment of a receiver, over the lien of a mortgage holder, when distributing the fund arising from the sale of the mortgaged property, has been frequently recognized. Except in those States, however, where specific provision has been made by statute for this priority, the doctrine rests upon the decisions of certain courts, chiefly the circuit courts of the United States. But it must be admitted that the doctrine has been recognized also by the Supreme Court of the United States in several of its rulings. This court has never ruled this question.

Preferential debts, it is said, are those which have aided to conserve the property of the railroad, thus resulting in benefit to the bondholders, and which have been contracted within a reasonable time prior to the receivership. While the doctrine or rule under which such debts have been given priority over mortgage liens is sometimes designated as the "six months rule," as if to indicate that the preferred debt must have been created within six months of the appointment of a receiver, an examination of the authorities upholding the rule discloses the fact that no such designation is authorized. In one instance priority was given to a debt contracted three years before the appointment of a receiver, in another the debt was contracted eleven months prior thereto, in another eight months, in another twelve months, and so on. See 99 U. S. 389; 111 U. S. 776; 12 Bush, 608; 9 Am. Ry. Repts. 386. The language of the various and varying decisions recognizing and sustaining the doctrine of preferential equities need not be

quoted. Suffice it to say, that in some of them the courts have gone to great lengths in giving preference over mortgage liens to unsecured debts, contracted before the appointment of a receiver, for labor, materials and the like. See 99 U. S. 389; 99 U. S. 235; 136 U. S. 89 and 97; 138 U. S. 501; 145 U. S. 82; 149 U. S. 95.

It is worthy of notice that in none of these rulings is it claimed that the right of priority rests upon any lien, legal or equitable. Such priority rests entirely upon a supposed superior equity. But while it is true that the Federal courts have in some instances gone quite far in recognizing the doctrine referred to, their rulings show that they have not been uniformly so. Thus in 11 Wallace, 459, it is said : "The principle applicable to maritime cases, which gives priority of. lien to the last creditor furnishing supplies and repairs for the conservation of the ship or voyage, does not apply to railroads. As to them the common law rule prevails, *qui prior est in tempore portior est in jure;*" and in 136 U. S. 89, cited above, the court says: "Upon these facts we remark, first, that the appointment of a receiver vests in the court no absolute control over the property, and no general authority to displace vested contract liens. Because in a few specified and limited cases this court has declared that unsecured claims were entitled to priority over mortgage debts, an idea seems to have obtained that a court appointing a receiver acquires power to give such preferences to any general and unsecured claims. It has been assumed that a court appointing a receiver could rightfully burden the mortgaged property for the payment of any unsecured indebtedness. Indeed, we are advised that some courts have made the appointment of a receiver conditional upon the payment of all unsecured indebtedness in preference to the mortgage liens sought to be enforced. Can anything be conceived which more thoroughly destroys the sacred-

ness of contract obligations? One holding a mortgage debt upon a railroad has the same right to demand and expect of the court respect for his vested and contracted priority as the holder of a mortgage on a farm or lot. So, when a court appoints a receiver of railroad property, it has no right to make that receivership conditional upon the payment of other than those few unsecured claims which, by the rulings of this court, have been declared to have an equitable priority. No one is bound to sell to a railroad company or to work for it, and whoever has dealing with a company whose property is mortgaged must be assumed to have dealt with it on the faith of its personal responsibility, and not in expectation of subsequently displacing the priority of the mortgage liens. It is the exception and not the rule that such priority of liens can be displaced. We emphasize the fact of the sacredness of contract liens, for the reason that there seems to be growing an idea that the chancellor, in the exercise of his equitable powers, has unlimited discretion in the matter of the displacement of vested liens."

But regardless of the reasoning of the Federal courts for or against so-called preferential equities, we are satisfied the doctrine has no place in this litigation, if, indeed, in can be invoked at all under the laws of this State. As has already been stated, this court has never ruled the question, and we are aware of no statutory or other express provision of law of force in this State upon which the doctrine can be rested. The petition of Marsh and others was evidently filed under the insolvent trader's act (Code, §3149), by the express terms of which it is provided that, "Upon the appointment of a receiver, no creditor shall acquire any preference, by any judgment or lien, or any suit or attachment under proceedings commenced after the filing of the bill, and all assignments and mortgages to pay or secure existing

debts made after the filing of said bill shall be vacated, and the assets divided *pro rata* among the creditors, preserving all existing liens." We think the intention of the legislature was clearly expressed in this provision of our law, and that its purpose evidently was to preserve and not to destroy liens when distributing the assets of an insolvent trader, firm or corporation. In *Blanchard & Burrus et al.* v. *Vansyckle & Company et al.*, 70 *Ga.* 283, it was held that, "Whilst it is true that, under the act of 1881, pre-existing liens are not to be interfered with, nor are parties with such liens to be hindered and delayed in the exercise of their usual and common law remedies, yet if they voluntarily come in and ask to be made parties defendant to a bill filed under this act, and submit their liens to that investigation which a court of equity may exercise over them, and they are assailed for invalidity, or cast under such suspicion as to induce the chancellor to put the property they are seeking to sell in the hands of a receiver, they must abide his judgment. But still, if the liens are valid, they must be preserved, and it will be the duty of the chancellor, under the law, to see that this is done." The same rule as to the preservation of liens prevails in the case of railroad corporations as in the case of other corporations or of traders in general. We think the court erred in not sustaining the exceptions filed to the report of the auditor, where these exceptions were based upon the allowance of unsecured debts over the mortgage lien of the bondholders and such allowance rested on no higher right than springs out of the doctrine of preferential equities. Under this view of the question, we think the following named claims should not have been given preference over the mortgage lien of the Central Trust Company of New York; and the judgment of the court, in so far as it gives this preference, is reversed.

Southern Railway Equipment Company ...... $  750.00

| | |
|---|---:|
| Buda Iron Works .............................. ..$ | 70.00 |
| Charles Scott Spring Co.......................... | 90.28 |
| A. H. Benning...................................... | 36.00 |
| J. P. Baker .............. .............'................ | 60.00 |
| Hammett & Word ................................ | 107.63 |
| Joseph Thompson, transferee, etc............... | 691.00 |
| James P. Harrison & Co.......................... | 192.85 |
| J. B. Wilson, for the use, etc. .................. | 659.75 |
| R. L. Robinson ......................... .......... | 678.02 |
| Western & Atlantic Railroad Co............... | 767.79 |
| Receivers East Tenn., Va. & Ga. Railway Co. | 5,029.86 |
| S. A. Fletcher & Co................................ | 1,590.00 |

Speaking for myself in what is said further on this subject, I think that the entire doctrine of preferential equities, as applicable to railroads, except where it rests upon statutory enactment, has been justly styled "court made law." It is a doctrine well calculated to destroy all confidence in the sacredness of contracts, to cause those who have parted with their money upon the faith of recognized liens to look with distrust upon the law and to doubt the protection of the courts. It seems to rest upon no firmer basis than the power of courts of last resort to violate the integrity of contracts, which power is to be exercised according to the individual opinion of the particular chancellor within whose jurisdiction the given case may happen to fall. It was argued by counsel representing some of the unsecured creditors, that "various rules are relied on to sustain the positions of the courts, which resolve themselves into an elastic rule depending upon the breadth of mind of the tribunal determining the matter." The elasticity of the rule renders it a very uncertain one. And further, it was argued, that, "There is no more difficulty in overcoming our statutory requirements than that which must have presented itself to the Supreme Court of the United States when they made ordinary debts superior

to the dignity, rank and power of a common law mortgage." The difficulty, I am persuaded, in "overcoming our statutory requirements" is not greater than that encountered by the Supreme Court of the United States "when they made" ordinary debts superior in rank to a mortgage, but the courts of this State have uniformly adhered to those fundamental principles upon which our political system rests, an important one being that all of the departments of the government are distinct. I confess to an inability to see wherein a party who furnishes a railroad an article which is consumed in its use, before a receiver is appointed, has an equity superior to the party who furnished the money with which the road itself was created, the fund to be distributed arising from the sale of that identical road.

The auditor found that the defendant railroad company was indebted to the Central Car Trust Company in the sum of $960.00, besides interest, and that the debt so owing was superior to the mortgage of the Central Trust Co. of New York. It appears from the evidence, that the Central Car Trust Co. sold to the Atlanta & Florida Railroad Co. three caboose cars for $2,400.00, and that the debt found to be owing, $960.00 and interest, was a balance due on the purchase price of the cars. It also appears that the Central Car Trust Co. reserved title to the cars until the full purchase price should be paid, and that the reservation of title was duly recorded. The receiver sold these cars with the other property of the railroad company, and they contributed in this way to the fund in court. Garrett, receiver, having used the cars during the time he operated the road, and having then sold them with the other property, thus appropriating them to the defendant company, the transaction may be treated as a purchase by him, and consequently as a part of the expenses of the receivership. The judgment of the court allowing this balance priority

over the bondholders' mortgage ·was right, and is affirmed.

2. Where a railroad is operated by a receiver, all his legitimate expenses, including the fees of his counsel, are chargeable upon the fund produced by a sale of the railroad made under a decree rendered in the cause, if there is no other fund under the control of the court out of which these expenses can be paid. Income would be chargeable before *corpus*, but as a last resort the charge would fall on the latter. This is the well settled general rule.

3. Counsel fees in a proceeding under section 3149(a) of the code, against an insolvent corporation, may be allowed for bringing the fund into court, but the scheme of the statute is that these fees, as a part of the expenses of the litigation, shall be borne in some just proportion by all who come in to claim the fruits of the proceeding. No suitor can rightly take any ·of these fruits without bearing his due proportion of such fees; and even a voluntary party defendant who ultimately shares in the fund which is realized, and takes it by the judgment or decree finally rendered, is chargeable the same as he would be had he intervened as a coplaintiff. It is provided by section 3149(c) of the code that, "Any creditor may become a party to said bill, under an order of the court, at any time before the final distribution of the assets, he becoming chargeable with his just proportion of the expenses of the previous proceeding." It will be observed that the statute just quoted makes no distinction between those who become parties to the proceeding, whether as plaintiff or defendant, and places upon each the obligation to pay his just proportion of the expenses. And this has been held to mean a just proportion of the expenses up to the time of becoming a party, and a like proportion to the end of the litigation. See 87 *Ga.* 134. We think that counsel fees were prop-

748      CENTRAL TRUST CO. *v.* THURMAN.      [94 Ga.

erly allowed in this case as a part of the expenses of the litigation, and that there is a preponderance of evidence in favor of the several amounts allowed; but we think it was error to so award the payment of the fees for bringing the fund into court as to cause the burden to fall entirely upon the mortgagee or the bondholders. We therefore affirm the judgment of the court below allowing counsel fees, and also affirm the judgment as to the several amounts allowed, with direction that the court, by proper proceeding, direct the payment of the allowance for bringing the fund into court, in some just proportion, by all of the parties to the cause who claim and participate in the fruits of the proceeding. The apportionment is not intended to apply to fees allowed the receiver's counsel for services rendered at his instance, nor to the allowance made to Mr. Rountree for services rendered during the receivership. The court had a legal discretion to compensate for these services, on the ground that they were beneficial to the receivership, although Mr. Rountree was not employed by the receiver.

4. It appears further from the record, that the auditor found in favor of the Southern Railway Equipment Company, one of the interveners, a balance of $2,367.68 for rental of 100 cars for four months, at $7.50 per car per month. Of this sum the auditor found that $1,617.68 was a lien upon the fund in court, superior to the lien of the bondholders, because it was owing for rental of cars under a contract made by Plant, as receiver, under authority of the United States circuit court for the southern district of Georgia. The cars were used by Plant, as receiver, under the contract so made between himself and the Southern Railway Equipment Company. The remainder of said sum of $2,367.68, to wit $750.00, the auditor found to be superior to the mortgage, because owing for car rental and because the indebtedness

was contracted within six months of the appointment of a receiver. What has already been said concerning preferential equities will dispose of the finding of the auditor as to the $750.00 claim. Nor do we think that the auditor should have allowed the claim for $1,617.68. A receiver of a State court is not chargeable with expenses incurred by a receiver of a Federal court while the property was in the hands of the latter, or for the hire of property which the latter used on a contract of hire made by him. Especially is this true where the appointment by the Federal court was void for want of jurisdiction. The judgment allowing the $1,617.68 is reversed, and the judgment as to the $750.00 is reversed in so far as it gives priority over the mortgage debt.

5. On October 14th, 1892, Benjamin Thurman obtained judgment in the city court of Atlanta for $600.00, being $300.00 for right of way and $300.00 as consequential damages. These sums the auditor allowed in his report, and they were likewise allowed by the judgment of the court. There was no exception to the allowance of $300.00 for right of way. The exception relates solely to the preference given the $300.00 as consequential damages. By art. I, sec. III, par. I, of the constitution of the State, it is provided that "Private property shall not be taken, or damaged, for public purposes, without just and adequate compensation being first paid." It will thus be seen that the constitution puts damage done to private property and the taking of it, for public use, on the same footing. Consequently, damage done to land by taking a portion of it for the way of a railroad ranks with the amount allowed for the right of way itself, in competition with a mortgage upon the railroad to secure other indebtedness of the company. The finding in favor of Thurman's priority for consequential damages was right, and the judgment of the court with reference thereto is affirmed.

6. It is insisted by the plaintiffs in error, that the original petition in this cause, having been filed under the insolvent trader's act (Code, §3149(a) *et seq.*), was not a cause of original equity cognizance, and that the court erred in not submitting the questions of fact raised, in the report of the auditor upon exceptions thereto, to the finding of a jury. Where a statute, such as section 3149(a) *et seq.* of the code, extends the equitable jurisdiction of the superior court to new cases, the mode of trial in such cases is governed by ordinary equity practice, and the right of trial of facts by master or auditor instead of by jury is subject to the will of the legislature. Acts 1884–5, p. 98; 77 *Ga.* 118; 80 *Ga.* 27; 90 *Ga.* 590. It follows that the court did not err in refusing to submit the questions of fact to the finding of a jury after overruling the exceptions to the finding of the auditor on the facts.

*Judgment reversed in part, and in part affirmed.*