CHIEF JUSTICE LINDSAY
delivered the opinion oe the court.
Prior to the year 1866 the Lexington & Frankfort Railroad Company had encumbered its property by a conveyance in the nature of a mortgage executed and delivered to Harrison & Hawkins. Of this mortgage indebtedness there remains unpaid $25,000, which has been due since July 1st, 1874. Prior to the same year the Louisville & Frankfort Railroad Company had encumbered its property by a mortgage to secure *702 the payment of the principal and interest of certain municipal bonds loaned it by the city of Louisville. One hundred of these bonds, aggregating $100,000, remain unpaid, and will mature on the 1st day of January, 1881. Said company had also encumbered its property by a subsequent mortgage to Guthrie and others, and of the indebtedness incurred under this mortgage there remains unpaid $35,000, which will mature July 1, 1878.
Pursuant to a legislative grant these two companies undertook to build, and did build, from Lagrange, in Oldham County, to Newport, in Campbell County, a branch railroad, and under the same authority jointly executed and delivered to Norvin Green a deed of trust bearing date January 1, 1867, conveying their joint roads and all their rights of property and franchises, including their right to construct this branch road, and also said road when constructed, to secure the payment of a joint bonded indebtedness then about to be contracted of $3,000,000.
Said companies were afterward consolidated under the name of the Louisville, Cincinnati & Lexington Railroad Company, and in April, 1870, this company mortgaged all its property to George L. Douglass to secure the payment of a bonded indebtedness of $1,000,000 which it then proposed to create.
And on the 1st day of April, 1873, said company mortgaged all its property, real and personal, together with its rights, privileges, and franchises, present and future, “ and also all the tolls, income, rents, issues, and profits, and alienable franchises of the party of the first part connected with its railroads, or relating thereto, including its rights and franchises as a corporation which may have been consolidated into the said Louisville, Cincinnati & Lexington Railroad Company, including all the rights and franchises of such several railroad corporations.” Only a small number of bonds were sold under this mortgage.
The three deeds to Green, Douglass, and Lees each contained *703 the stipulation that in case of default in the payment of interest on the bonded debt for a specified time the bondholders might elect to treat the principal as due and payable, and the trustee might take possession of and operate the company’s roads and receive the tolls, incomes, and earnings. Default was made, and all the necessary preliminary steps having been taken, Douglass, the trustee named in the mortgage bearing date April 1, 1870, instituted his action in the Louisville Chancery Court on the 25th day of July, 1874, and sought to have the mortgaged property sold, and in the meantime to have the roads, rolling stock, etc., placed in the hands of a receiver and operated for the benefit of the mortgage creditors. He made the representatives of the creditors secured by each of the senior mortgages defendants to his action. Green made his answer a cross-petition, and joined with Douglass in his prayer for specific relief.
September 21, 1874, the mortgaged property was placed in the hands of a receiver. Pending the preparation of the cause a considerable sum of money accumulated in his hands, and numerous unsecured creditors of the company, having judgments and returns of nulla bona, instituted their actions in the chancery court and sued out and levied orders of attachment on this fund.
A large number of persons having claims against the insolvent corporation or its property had themselves made parties to the litigation. The cause was finally heard, and from the judgment of the chancellor, rendered on the 1st day of July, 1876, these appeals are prosecuted.
The court preferred the bondholders, secured by the mortgages executed in 1870 and prior to that year, to the attaching creditors in the distribution of the fund in the hands of the receiver, and the complaints of the appellants based on this ruling, will be the first question considered.
1. It was held by the majority of this court in the late case of Douglass, &c. v. Cline, &c. (12 Bush, 608) that the trustees *704 in the deeds to Green and Douglass did not take the necessary steps to secure to the beneficiaries in those mortgages the earnings, incomes, rents, and profits of the mortgaged property by taking possession of and operating it by themselves, their agents, or special receivers, and for the purposes of these appeals we need not again consider that question.
We are further of opinion that the appellees are not entitled to this fund by virtue of the mere fact that they are mortgagees. When, as under the ancient English rule, the mortgagee was deemed the owner of the mortgaged property, the mortgagor having only the right to redeem or perform the condition of the mortgage at an appointed time, it was naturally held that the mortgagee or owner was entitled to the rents, profits, and issues of his own property. This rigid rule has been gradually relaxed through the persistent encroachments of courts of equity until we have at length reached the point at which the real contract entered into between the parties will be carried out according to its true intent and spirit, and this, by treating it as well at law as in equity as a security for the payment of money, or an indemnity against liability incurred by the mortgagee for the benefit or at the instance of the mortgagor, the conveyance to be void when the stipulated condition shall be performed.
In this state we have never regarded the mortgagee as the owner of the mortgaged property, and it is doubtful whether at any time a court of equity would for his benefit decree a strict foreclosure and bar the mortgagor’s equity of redemption without a sale of the property. (2 B. Mon. 205.)
But inasmuch as the deed of mortgage invested the mortgagee with the legal title to the thing pledged, he could recover possession by action at law against the mortgagor after his failure to perform the condition; and hence equity would in many instances interfere to secure for him the rents, profits, and issues of the mortgaged estate, even when he had failed to *705 enforce his legal right to the possession. But whether he entered at law or secured the rents, profits, and issues by-contract or notice to the mortgagor, or his tenants after forfeiture, they were applied to the satisfaction of the mortgage debt, and as soon as that was extinguished the title aud right of possession with all its incidents at once reverted to the mortgagor. "We thus see that the absolute right .to take the rents and profits resulted from and was dependent upon the legal right of the mortgagee to oust the mortgagor from the possession.
This legal right was lost with the adoption of the Civil Code of Practice. The mortgagee can not now prevail in an action at law against the mortgagor who is the real owner of the mortgaged property. To an action at law for possession the mortgagor may answer and rely on the fact that he is the owner of the mortgaged premises, and that his title is merely in pledge for a specific purpose, and on his motion the cause will be transferred to the equity side of the docket, where the security of the complainant can and will be made available for all the purposes of his lien, and the defendant at the same timé be protected against the unnecessary hardships which frequently resulted from the old rule of treating the mere lien-holder as the owner of the estate.
Having no longer the absolute right to possession, the mortgagee does not now have the absolute right to its incidents — the rents, issues, and profits of the thing mortgaged. He may secure these incidents by express contract, but if he fails to do this he must reach them through a proceeding in equity; and the Civil Code of Practice, which so far impaired his remedy at law, gives him in lieu thereof the right, through a receiver in equity, in a proper state of case to have them intercepted and held for his security.
Section 329, Civil Code, provides that “ in an action by a mortgagee for the foreclosure of his mortgage and sale of the *706 mortgaged property a receiver may in like manner be appointed where it appears that the mortgaged property is in danger of being lost, removed, or materially injured, or that the condition of the mortgage has not been performed, and that the property is probably insufficient to discharge the mortgage debt.”
It is argued by counsel for the attaching creditors that under this section the mortgagee has no other or greater right than a vendor suing to vacate a fraudulent purchase of property, or a creditor seeking to subject specific property or money to his claim, or a partner or joint owner suing his partner or another joint owner, or any other plaintiff having a probable interest in property or a fund in litigation; each and all of whom may have a receiver under section 328, when it is shown that the property or fund is in danger of being lost, removed, or materially injured. There would be much force in this argument if section 329 was not more comprehensive in its terms than the section applicable to such parties. Like them the mortgagee may have a receiver when the mortgaged property is in danger of being lost, removed, or materially injured; but independent of this danger he has the right as against the mortgagor to a receiver when it appears “that the condition of the mortgage has not been performed, and that the property is probably insufficient to discharge the mortgage debt.”
It is evident this remedy was not provided for the mere purpose of enabling the lienholder to have the mortgaged property protected and preserved. If this is its only purpose, section 329 is superfluous. It might have been as well accomplished by including mortgagees in section 328.
The latter clause of section 329 meets and provides for a case, in which the condition of the mortgage has been broken and there is a probability the mortgaged property is not sufficient to pay the ■ debt. It was manifestly intended to aid the mortgagee in having his contract carried out according to its true spirit, by securing, as far as possible, out of the thing *707 mortgaged and its rents, profits, and issues, the payment of his claim.
The right thus to appropriate the rents, issues, etc., was a legal incident to the contract of mortgage so long as the mortgagee could have relief at law; and since his remedy at law has been practically taken away, the statute authorizes courts of equity to treat it as an equitable incident, and as between the parties to the mortgage, this incident will be upheld and enforced whenever the mortgagee brings himself within the state of case contemplated by section 329 of the Civil Code.
That equities of third parties may sometimes so far intervene as to estop the mortgagee, in good conscience and fair dealing, to claim the full benefit of this equitable right at the hands of the chancellor (as in the case of Douglass v. Cline), does not militate against the conclusion, that as against the mortgagor, the statute provides for the interposition of courts of equity through their receivers, for the purpose of collecting and holding for the better security of the mortgagee the rents, issues, and profits of the mortgaged property which may accrue pending an action for foreclosure and sale.
The purpose of the mortgage is the security of the full payment of the mortgage debt; and when there is a reasonable probability that such purpose will be defeated if the mortgagor be left in the enjoyment of the property pledged, the power and duty of the chancellor to interfere for the protection of the mortgagee can not, in our opinion, be questioned.
We do not deem it necessary to decide whether the mortgagee who has proceeded under this provision of the Civil Code occupies toward the fund accumulated by the receiver the attitude of a lienholder or of a claimant under a Us pen-dens. It is sufficient that the court, through its officer, holds the fund for his protection, and that it is the duty of the court to apply it, or so much of it as may be necessary, to the satisfaction of his debt in case the mortgaged property proves *708 insufficient for th'a^ purpose; and, for the accomplishment of this end, the mortgagee-.may demand that the fund shall be held against the' mortgagor and all persons claiming under or through him. One of the grounds on -which Douglass rested his motion for the receiver was the probable insufficiency of the’ mortgaged property to pay the bondholders claiming under his mortgage after satisfying the amounts due to the elder and superior lienholders.
This ground was established by the facts developed in the record, and the prayer of Douglass that the property should be placed in the hands of a receiver pending the litigation and the earnings, profits, etc., applied as ordered by the court considered in connection with the basis of his motion sufficiently indicated his desire to have these earnings and profits held and applied for the better protection of the bondholders represented by him; and, until these bondholders are fully protected, the attaching creditors are entitled to no portion of the fund accumulated by the receiver. The mortgagor can not sell, assign, or in any way dispose of this fund, to the prejudice of the beneficiaries under the Douglass mortgage, for the purpose of satisfying the claims of his unsecured creditors, nor for any other purpose, nor can those creditors by orders of attachment or garnishee process secure for themselves a more favorable footing than that held by their debtor, and thus appropriate for their benefit a fund beyond his control, even if unembarrassed by their proceedings.
“A fundamental doctrine of garnishment is that the plaintiff does not acquire any greater rights against the garnishee ■than the defendant himself possesses. When, therefore, the •attachment plaintiff seeks to avail himself of the rights of the defendant against the garnishee, his recourse against the latter must of necessity be limited by the extent of the gar•nishee’s liability to the defendant.” (Drake on Attachments, sec. 458.)
*709 The garnishee in these actions is the receiver of the chancery court. He holds the fund in contest under the orders of that court for the protection and security of certain mortgage creditors, and he has no right with the consent and active co-operation of the common debtor to do any act calculated to defeat or impair the rights of those creditors; and as the stream can not rise higher than its source, the attaching creditors, who must reach this fund, if at all, through the debtor and the garnishee, can not be assisted to appropriate it to the prejudice of the parties for whose benefit it has been accuiüur lated and is now being held.
A careful examination of the Civil Code of Practice and of the decisions of this court has satisfied us there is no statutory rule of procedure, and no rule of judicial interpretation, in conflict with this conclusion. We need not therefore inquire whether a fund in the hands of the receiver of a court may, without the express consent of such court first obtained, be legally attached.
2. The Western Bank insists that in any event it holds a superior lien upon a portion of the fund in the hands of the receiver. Having a return of “no property found” on a judgment against the railroad company, this bank instituted its action in the chancery court under the provisions of section 474 Civil Code of Practice July 11, 1874, two weeks before the institution by Douglass of his suit, and more than two months before the appointment of the receiver. The marshal made return that he had levied the order of attachment on the company’s roads and equipments, rights, and franchises, and on its “ income, tolls, rents, issues and profits.”
A copy of the process on which was indorsed the object of the action, to wit, to appropriate these “incomes, tolls, rents, issues and profits” to the payment of the plaintiff’s judgment, was duly served on the president of the company. A considerable sum of money, earned subsequent to the levy of the *710 attachment and the service of this process or summons, and before the appointment of a receiver, has been collected by that officer. Section 477 of the Civil Code provides that in actions prosecuted under section 474 “a lien shall be created on the property of the defendant by the levy of the attachment or service of the summons, with the object of the action indorsed thereon, on the person holding or controlling his property.”
The character of the lien, if any, created by the levy of the order of attachment on the roads, equipments, rights, and franchises of the company we need not decide. It was certainly subordinate to the mortgage liens of Green, Douglass, and Lees, and it gave the bank no claim to the incomes, earnings, profits, and issues of the property. The marshal does not state the manner in which he seized these intangible rights of property, and we suppose he meant only to say that by the service ,i¡j‘of the summons he notified the president of the company of s the purpose of the action instituted by the bank. The effect of this notice is therefore the important inquiry in this case.
The officers of a railroad company hold the earnings and profits of its roads as a trust fund for the payment of its debts. But in the absence of contract liens, or rights created by legal proceedings, they may exercise a reasonable and proper discretion as to the order in which the debts shall be paid, and this discretion can not be taken from them by notice to the company that a particular creditor intends to demand a preference. The notice of the Western Bank can not avail for any purpose unless the law imparts to it some extraordinary quality.
By section 474 of the Civil Code the judgment creditor may make defendants to his action, to enforce the satisfaction of his judgment, persons indebted to or holding the money or property of his debtor or the evidences or securities for such money or property; and by section 477, already quoted,he may create a lien on this property or money by serving on the party so *711 made a defendant a summons with the object of the action indorsed thereon. If, in this case, the bank intended to treat the president of the company as a person holding its property or money, it should have made him a party defendant to its action. The delivery of the summons to that officer, he not being a party, was but the service of the process upon the company itself, and there is no section of the Code which provides that an attachment lien on intangible property may be created by the service of any character of process on the judgment defendant alone.
Without expressing an opinion as to whether or not the money of a corporation can be attached in the hands of its officers and servants, we hold in this case that the provisions of the Code were not pursued-, and that no lien on or claim to any moneys that may have passed into the hands of the receiver was created; and we further hold that these moneys should be regarded as having been paid out on the debts due to Cline and the other operatives who were provided for by the order of the chancery court.
3. Some of the attaching creditors attempted to have the order appointing the receiver so far extended and modified as to provide for the payment of their claims. None of these parties made out such a state of case as that presented by Cline and his associates, and we can not say the chancellor did not properly exercise his equitable discretion in refusing to make the extensions and modifications proposed. In view of this fact his refusal does not, according to the doctrine of the case of Douglass and Cline, entitle any of -these appellants to relief at the hands of this court.
4. The Newport & Cincinnati Bridge Company insists upon certain questions not presented by the other appellants. The defendant corporation contracted with that company for the use of its bridge across the Ohio River between the cities of Cincinnati and Newport. This contract fixes the rate of tolls *712 to be paid for tbe various classes of cars, freight, etc., and stipulates that the defendant corporation and the Pittsburgh, Cincinnati & St. Louis Railway Company shall guarantee that these tolls shall amount annually to a sum not less than $75,000. By its own terms this contract was to be perpetual. The bridge company and the other guarantor complain because the judgment of sale does not provide that the purchaser of the mortgaged roads shall be required to carry out and execute the terms of this contract. The liens of all the mortgagees, except Douglass and Lees, are elder, and therefore superior, to any claim that can be asserted by the bridge company, and these elder encumbrancers are in no wise bound or compromised by an arrangement that must, ex necessitate, terminate when their debtor loses the power to control and operate its roads. “The mortgagee coming in by superior title takes the subject of his mortgage clear of all obligations contracted by the mortgagor, whether personal to himself or relating to his management of the property." (Ellis v. Boston & Hartford Railroad Company, 107 Mass. 1.)
And this contract does not impair the rights of Douglass and Lees to the things mortgaged. Its performance was not attempted to be secured by a lien on the property- of the railroad company, and while the non-performance of its terms may entitle the bridge company to insist on the benefits of its guaranty, neither it nor the guarantor can have specific execution against the consent and at the expense of parties who have been prudent enough to secure themselves by contract liens on the property of their debtor.
These appellants and the Pennsylvania Company insist, further, that one half the bonds secured by the Douglass mortgage are. void, because they do not conform in their terms to the provisions of the act under which they were issued, and because the money for which they were sold was not applied as contemplated by that act.
*713 The act of March 21, 1870, provides that “the Louisville, Lexington & Cincinnati Railroad Company shall have power to issue and sell additional capital stock to said county of Scott, to such other counties, to private individuals, or other parties, not exceeding an aggregate additional of $1,000,000, and may issue and sell bonds of said company, in like manner as heretofore authoi'ized, for an amount not exceeding an aggregate additional sum. of $500,000, and secure payment of the same by a mortgage-lien on all the properties and franchises of said company, subject to the precedence of such prior lien as may exist thereon.”
The “like manner as heretofore authorized” appears from the provisions of the second section of an act of Feb. 8, 1870, to the effect that certain bonds to be issued under that act should bear “a rate of interest not exceeding eight per cent per annum, and having not more than thirty years to run.” It was no violation of this act to make the interest payable semi-annually, and to contract that in default of the reasonably prompt payment of the interest as it should accrue, the principal sum might be treated as due and payable. (Radford v. Southern Mutual Life Ins. Co., 12 Bush, 434.)
The company did accept this amendment to its charter by issuing and selling these bonds and by the execution of the mortgage to secure their payment; and if it be conceded the legislature intended-that out of their proceeds branch roads should be constructed into Seott and other counties, and that this intention has been defeated by the failure of the company to construct these- roads, still the duty of the company to pay the bonds, and the duty of -the chancellor to subject to their payment the security pledged for that purpose, can not be called in question because of the subsequent default of the company in the performance of a public duty.
We have carefully looked into the record before us, hoping to find facts upon which to base the conclusion that the in *714 terest in arrear might be paid up, and the forfeitures of the various mortgages thus redeemed within a period of time sufficiently reasonable to authorize the chancellor to decline to proceed further with the proceedings for foreclosure and sale, but the facts disclosed do not justify that belief, and we perceive no reason why the mortgagees may not, in equity and good conscience, insist on the enforcement of their contract rights.
5. The ground on which the Louisville Transfer Company was preferred for any portion of its claim is not very clearly made out, and we feel no hesitancy in holding it has no right to complain that the preference was not carried further.
6. If it be true that the money borrowed from the Masonic Bank was used in the payment of interest due on the mortgage debts of the company, that fact does not entitle the bank to be paid out of the funds in the hands of the receiver. It does not hold the interest-coupons taken up with the money, and its loans were not made on the agreement or understanding that it was to be treated as the assignee of the holders of these coupons, nor under circumstances entitling it to be subrogated to their rights.
7. By the mortgage of April 1,1873, the company conveyed and set over to Lees, among other things, “all the tolls, income, rents, issues, and profits, and alienable franchises of the party of the first part, connected with its railroads or relating thereto, including its rights and franchises as a corporation, or connected with or appertaining to any of the several railroad corporations which have been consolidated into the said Louisville, Cincinnati & Lexington Railroad Company, including all the rights and franchises of such several railroad corporations.” It is claimed this specific pledge of the tolls, incomes, rents, issues, and profits entitles the beneficiaries under this mortgage to the fund raised by the receiver, to the exclusion of the parties at whose instance and for whose benefit he was appointed. *715 One of the conditions of the mortgage to Lees is that the company shall keep paid up the interest as it accrues on the bonds secured by the prior mortgages, and also pay off and discharge said mortgages at maturity or whenever it shall be necessary to protect the security then being created; and upon the failure of the company to keep this or any other condition, the mortgagee, after taking certain preliminary steps, and upon the request of a certain number of the holders of the mortgage bonds, was to have the right to take possession and operate the mortgaged roads. But should he exercise this right, he was bound out of their incomes and earnings, after the payment of the operating expenses, to pay all taxes and assessments and then the “interest on prior mortgages.”
These stipulations are perfectly consistent with the idea that in no contingency were the earnings and incomes of the roads to be applied for the immediate benefit of the holders of bonds issued under the Lees mortgage so long as there should remain outstanding and unpaid accrued interest on any of the prior mortgage debts. There is nothing in the Lees mortgage indicating an intention to interfere with the contract rights of prior mortgagees or to prejudice them in the enforcement of the equitable remedy provided for the benefit of mortgagees by the 329th section of the Civil Code. The holders of the bonds intended to be secured by-the mortgage to Lees purchased with implied notice of the contract rights and statutory remedies of the beneficiaries under the elder mortgages and deeds of trust, and they have no right to complain that the chancellor subordinated their claims to these elder and superior rights.
8. The commonwealth of Kentucky upon its appeal presents questions differing from those we have thus far been considering.
(a) The superior dignity of the claims of the commonwealth for taxes due on the encumbered property is not *716 denied by any of the lienholders. But the chancellor refused to enforce the tax lien for the full amount of taxes due in the year 1875, because of an alleged indebtedness of the commonwealth to the receiver for services rendered by him in his official character in the transportation of troops and material upon the order of the governor. We do not question the correctness or the justice of the receiver’s claim. He can not set it off against the taxes levied by the state for the support of government. In the imposition of taxes the state acts in its sovereign character; and where it finds it necessary or convenient to resort to the courts to enforce the performance of the public duty, or the satisfaction of the public burden resting on the tax-payer, it can not be met and defeated by an ordinary plea of set-off. This public duty is absolute and imperative. The tax is not a mere debt due from the citizen to the government, and the courts have no power to treat it as a debt without the express sanction of the legislature. It was therefore error to allow the appellees credits by the amount of this claim.
(b) The claims for taxes against the two old companies— the Louisville & Frankfort and the Lexington & Frankfort railroad companies — on account of a yearly balance not included in the assessments from 1865 to 1873 inclusive, were properly rejected. The amount of taxes due from those companies for the years mentioned was once the subject of litigation. The commonwealth may have adopted a mistaken basis of assessment, but it has once had its day in court; and so long as the judgment heretofore rendered in its favor remains in force it can not have a re-trial of the issues once litigated, nor of issues which, according to the established rules of procedure, ought to have been litigated.
(e) The claim based on the provisions of section 52 of the act of March 1, 1847, incorporating the Louisville & Frankfort Railroad Company, and the bond executed pursuant *717 thereto, was to some extent considered by this court in the case of The Railroad Company v. The Commonwealth (MS. opinion, Oct. 12, 1875).
The statute and the bond provide that the company shall pay into the treasury of the commonwealth, for the use of the sinking fund, interest at the rate of six per centum per annum on the sum of $74,519.50 from and after the completion of the road from Louisville to Frankfort, before each and every payment of dividends to the stockholders shall be declared and made.
The consideration for this bond was the transfer by the state of its interest in the railroad then being constructed between Louisville and Frankfort.
The question involved in the case decided in October, 1875, was as to the right of the state to recover for installments of interest then past due and in arrears, and this court divided equally as to whether this interest was to be paid at the end of each year, regardless of whether a dividend should or not be declared; but it was unanimously of opinion that, before any dividend could be paid to the stockholders, the company was bound to pay to the commonwealth an amount equal to all the interest in arrear. There was no division of opinion as to the fact that the interest was all the while accruing. The difference was as to the time at which the creditor could demand its payment.
(d) The Commonwealth claims also that it has a vendor’s lien to secure the payment of the bond, principal as well as interest; and as all the property of the debtor is about to be sold, and its corporate existence destroyed, that it may now demand the enforcement of its lien; and in this view this court concurs. But this right will not be enforced to the prejudice of the holders of the bonds of the company. , The mortgages and deeds of trust under which these bonds were issued and sold were each executed pursuant to express authority from *718 the commonwealth, and none of the enabling acts contains an intimation that the contemplated pledge is to be held subject to the lien of the state.
In the case of Mosely v. Garrett (1 J. J. Marshall, 216) the vendor had not conveyed the legal title, and yet, because he stood by and permitted the estate to be mortgaged without objection, the court postponed his vendor’s lien to that of the mortgagee upon the theory that “ if a person having a right to an estate encourage or even permit a purchaser to buy it of another the purchaser will hold against the person who has the right.” (3 Littell, 55.) Here the commonwealth expressly authorized, and in effect invited the mortgagees to accept the various conveyances, and the holders' of the mortgage bonds are no more affected by their implied notice of its Hen than was the mortgagee by his constructive notice of the vendor’s lien in the case supra of Mosely v. Garrett.
(e) The exact nature of the claim for damages awarded on the affirmance of the judgment of the Franklin Circuit Court by this court is not very clearly stated. But we are satisfied it does not constitute a Hen against the property of the company. It is secured, if at all, by the sureties in the supersedeas bond.
(/) It is provided by sec. 4, art. 5, chap. 5 of the General Statutes that in addition to the salary of the attorney-general there shall be added to all judgments rendered in the fiscal courts in favor of the commonwealth two per centum upon the amount thereof, except as to damages awarded, which shall be collected by the collecting officers; and this sum, when paid into the treasury shall, upon the warrant of the auditor, be paid to the attorney-general for services rendered. The additional two per cent is to be treated as costs, and is part of the sum to be recovered by the commonwealth.
The auditor may institute actions in any circuit court, or any court of similar jurisdiction, ordinary or equitable, to col *719 lect the public revenues or other demand or penalty due the commonwealth, “ or to have satisfaction made of judgments in the name of the commonwealth.” (Sec. 17, art. 11, chap. 92 General Statutes, and sec. 28, chap. 21, ibid.)
And for the purposes of these particular actions such courts are to be deemed fiscal courts, and the attorney-general, in case he prosecutes the action, is to receive his legal fees, which are to be recovered as costs by the commonwealth. (Sec. 17, art. 11, chap. 92.)
The attorney-general represented the commonwealth in this case, and it has the right to have the two per centum to which he is entitled for his services added to the sum adjudged in its favor, and also to have its superior lien enforced to insure the collection of the judgments so made up.
It seems, however, the two per centum adjudged to the commonwealth as fees for the attorney-general for prosecuting the actions in the Franklin Circuit Court in which the three judgments in personam for the sums respectively of $19,200, $14,594.38, and $28,994.34 were recovered, has already been paid. The company will have credit by this payment, but this credit will not affect the right, of the commonwealth to recover an additional two per centum on the unpaid balance to compensate the attorney-general for services rendered in prosecuting its claims in this action.
9 (a) It is not material that the heirs-at-law of some of the deceased trustees in the various mortgages and deeds of trust are not before the court. We will not inquire whether persons representing in full the legal title are in court. The person or persons who held the legal title held it in naked trust. The personal duties imposed on them in certain named' contingencies did not pass to the heirs-at-law of such of them as may have died. And in any event the chancellor can sell the trust property and pass a perfect title to the purchaser.
It was provided by the Revised Statutes — and the section *720 was continued in force by the General Statutes — that liens by deed or mortgage may be discharged by an entry of satisfaction on the margin of the record by the holder of the lien debt or his personal representative properly attested, and in the case of a deed of trust or mortgage this entry re-invests the mortgagee or the person entitled thereto with the title to the property. The statute was not intended to change the law theretofore in existence, if no such entry shall be made. By the pre-existing law the payment of the mortgage debt extinguishes the mortgage. It ceases to operate, and the whole title is at once re-vested in the mortgagor. (Hilliard on Mortgages, 4th ed., vol. 1, p. 473; Hawkins’s heirs v. King, 2 Marshall, 109.)
In this case the beneficiaries in the various mortgages are each and all properly in court by representation. If the mortgaged property shall sell for a sum sufficient to satisfy all their claims, that satisfaction will re-vest the legal title in the mortgagor, and under the judgment of the chancellor it will pass at once to the purchaser. On the other hand, if the proceeds of the sale fail to pay the mortgage debts, still the judgment of the chancellor will as effectually release the lien of the beneficiaries under the several mortgages and deeds of trust, and as completely invest the title in the purchaser, who will be “ the person entitled thereto,” as if said beneficiaries, had entered satisfaction on the margins of the record books.
(b) Some of the bonds issued under the later mortgages are in pledge to certain of the company’s creditors. These bonds should be paid to the extent necessary to satisfy the debts for which they are held as collateral security, and no further.
(c) The Masonic Savings Bank and the Western Bank held certain bonds as collaterals. They proceeded in equity and had them sold by the judgment of the chancellor. At the judicial sales they became the purchasers of the securities held by them respectively. These purchases invested them with *721 title to the bonds, and the chancellor did not err in recognizing and enforcing their rights as owners for value.
(d) We will not determine whether the levy of orders of attachment on the property of a railroad corporation creates an enforceable lien. The levies in this case have no practical effect except in settling the priorities of the attaching creditors, and of this none of these creditors complain. The entire property of the railroad company, including all its vendible rights, franchises, and immunities, must be sold to satisfy the claims of the encumbrancers. They have the right to have it sold as an entirety. If a surplus fund remains after the payment of their debts, it must be paid to the unsecured creditors, and the company has no substantial interest in the distribution of this fund further than that it shall be paid to its creditors, and this the judgment provides for.
(e) It was not error to allow the trustees compensation for the services of themselves and counsel. They are not creditors. They represent the debtors as well as the creditors, and in the the institution and prosecution of the actions resulting in the judgment appealed from they discharged duties imposed on them as the agents of the parties in interest, including the railroad company.
(/) The chancellor properly permitted Cochran to act as trustee for the holders of bonds issued under the mortgage to Lees. Equity would not permit the trust to fail for the want of a trustee; and having ratified the selection of Cochran by the parties in interest, it was proper that the chancellor should allow him the compensation provided for in the mortgage.
(g) The election of the bondholders to treat the default in the payment of interest as a. forfeiture of the contracts, so far as they prescribe the length of time for which the bonds were to run, operated, prima faeie, to cancel all coupons representing installments of interest not then due; and unless the mortgaged property shall be sold subject to some one or more *722 of the elder mortgages this election should be regarded as having precipitated the payment of the principal sums, and they will bear interest at the agreed rate per annum. (Radford v. Southern Mutual L. Ins. Co., 12 Bush, 434.)
In entering up the judgments the chancellor will provide that the coupons not due at the date of the respective elections by the bondholders of such of the mortgages as shall not be left in full force by the marshal’s sale shall be disregarded, and interest allowed them from that time forward, as hereinbefore indicated.
(/i) The judgment requires the purchaser to pay immediately to the marshal the sum of $20,000, to be held by the court as an earnest of the good faith of the purchaser, which sum is to be returned to him as soon as he complies with the terms of the sale. The propriety of thus providing against annoyance from fictitious .bidders we do not question, but it seems to this court that it would accord better with the spirit' of our statutes regulating judicial sales to require the immediate execution of a bond for a similar sum, conditioned that the purchaser shall comply with the terms of the sale or indemnify the parties by the payment of the costs and damages resulting from default on his part.
(i) The railroads and their appurtenances are sufficiently described in the judgment.
(J) The terms of the sale comply literally with the act of March 7, 1876. (Session Acts 1876, page 39.)
Upon the appeals of the-Newport & Cincinnati Bridge Co., the Pittsburgh, Cincinnati & St. Louis Railway Co., the Pennsylvania Co., John P. Morton, John P. Morton & Co., the Louisville Bridge Co., the Western Bank, the Masonic Widows ¡and Orphans’ Home, the Farmers Bank of Kentucky, the Masonic Bank, Robert Elliston, John J. Leary, Martha Marks-bury, &c., R. H. Stout, A. Montgomery & Co., George R. Harms, Gavin H. Cochran, the Mt. Vernon, Cleveland & Del *723 aware B. Co., Murty Shea, and the Louisville Transfer Co. the judgment is affirmed.
But on the appeals of the Commonwealth of Kentucky and the Louisville, Cincinnati & Lexington Railroad Company the judgment is reversed, for the reasons and to the extent indicated by this opinion, and the cause is remanded for a judgment conforming to the principles herein announced.