# Watt's Administrator et al. v. Smith et al.

(Decided Oct. 13, 1933.)

C. E. RANKIN and C. S. MATHERLY for appellants.

E. H. GAITHER for appellees.

ALVAN H. CLARK, WHITE & CLARK, D. O. MYATT, H. W. LINTON and SELDEN Y. TRIMBLE amici curiæ.

OPINION OF THE COURT BY JUDGE DIETZMAN—Affirming in part, and reversing in part.

On January 1, 1919, John Brewer and Charles H. Smith, executors of H. C. Smith, deceased, conveyed a tract of land in Mercer county to Gilbert Watts for $8,000 in cash and the following notes, one for $691.55 due March 1, 1919, one for $257.05 due January 1, 1920, one for $5,794.36 due January 1, 1921, one for $5,000 due January 1, 1922, one for $794.36 due January 1, 1922, all of these notes being payable to Charles H. Smith, and one for $5,537.31 due January 1, 1920, payable to the executors. No lien to secure any of these notes was expressly retained in the deed. The note for $5,537.31, payable to the executors, was later transferred to Price T. Smith. Watts in due time paid the two notes for $691.55 and $257.05. On July 16, 1921, Watts executed a chattel mortgage on some stock, farming implements, and growing crops to Charles H. Smith to secure: First, the note of $5,537.31 mentioned in the 1919 deed; and, secondly, a note of $787.50 dated January 11, 1921, said to represent unpaid interest on the notes set out in the 1919 deed. On March 1, 1923, Watts executed a mortgage covering the land that had been conveyed to him by Charles H. Smith and Price T. Smith to secure: First, the payment of a note for $3,000, payable to the order of Price T. Smith and a note for $14,000 payable to the order of Charles H.

Smith, the two notes being executed contemporaneously with the mortgage; and, secondly, a second lien note in favor of the Mercer National Bank of Harrodsburg. The mortgage recited that it conveyed a first and superior lien on the property covered by it "together with the rents, issues and profits thereof to Price T. Smith and Charles H. Smith, to secure to them the full payment of their two notes." The habendum clause of the mortgage read:

> "To have and to hold said real estate with the improvements thereon and the appurtenances thereunto belonging and the rents, issues and profits thereof unto the mortgagees and unto their heirs, successors and assigns forever."

The mortgage also recited:

> "The indebtedness hereby created is for the purpose of taking the place of the land notes now against the same land and held by the same parties."

It is conceded that these two notes payable to Price T. Smith and Charles H. Smith represented all the notes set out in the 1919 deed and in the 1921 chattel mortgage. On March 12, 1923, the grantors in the 1919 deed entered on the margin of the deed book in the county clerk's office, at the page where the 1919 deed was recorded, the following:

> "All the notes set out and mentioned in the within deed of H. C. Smith's Exrs. to Gilbert Watts having now been fully paid, all liens are hereby released and fully discharged."

This release was then signed by the said grantors. The chattel mortgage of 1921, however, was not released of record nor has it ever been. Watts died in 1930. At the time of his death, there was in the tobacco barn a crop of tobacco which he had grown that year on the land which had been conveyed to him in 1919. This crop the administrator, by agreement of the parties, later sold; it bringing $794.62. Watts also at the time of his death had in his possession so much of the personalty covered by the chattel mortgage of 1921 as was later sold under agreement of the parties, bringing $347.50. These two items total $1,142.12. The mortgage debt of 1923 not having been paid, the real estate conveyed in 1919 and covered by the 1923 mortgage was

ordered sold. It brought the sum of $16,140.95. The mortgage notes of the 1923 mortgage at the time amounted to $17,319.19, principal and interest. Deducting therefrom the proceeds of the judicial sale, there was left due the holders of the 1923 mortgage notes the sum of $1,178.24. To this sum must be added interest to the date of judgment herein appealed from, the total amount due being $1,228.12. To discharge this last-named sum, the holders of the first lien 1923 mortgage notes laid claim to the $1,142.12 arising out of the sale of the tobacco crop and personalty above mentioned. They based their claim to the proceeds of the tobacco on the provision in their mortgage pledging "the rents, issues and profits" of the land mortgaged and to the proceeds of the personalty on the lien created by the 1921 chattel mortgage. Watts' estate being considerably indebted beyond the mortgage indebtedness hereinbefore referred to, and there being no assets other than this sum of $1,142.12 wherewith to pay the same, the administrator resisted the claim of these holders of the 1923 mortgage notes to this sum. He also made claim to a commission of 5 per cent. on the money involved as an administrator's commission for winding up the estate of the deceased. The lower court awarded the whole sum of $1,142.12 to the holders of the first lien 1923 mortgage notes, and the administrator has appealed.

First, with reference to the claim of the holders of the 1923 first lien mortgage notes to the proceeds of the personalty covered by the 1921 chattel mortgage: It is contended by the administrator that the taking by the Smiths of the new notes and mortgage in 1923 was a novation of the debts created by the 1919 deed and 1921 chattel mortgage and served to release the 1921 chattel mortgage though that mortgage was never released of record. The parties are agreed that a "novation" is a contract between the parties whereby, for a valuable consideration, a creditor agrees to cancel an old obligation and to substitute in its place a new one. 20 R. C. L. 371; 46 C. J. 623. To this we may add that it is not essential that the assent to the terms of the novation be shown by express words to that effect, but the same may be implied from the circumstances attending the transaction and the conduct of the parties thereafter. Kushner v. Knopf, 227 Ky. 369, 13 S. W. (2d)

271. Applying these principles to the instant case, we find that the 1921 chattel mortgage was given to secure one of the notes set out in the 1919 deed and another note conceded to represent unpaid interest on those notes of the 1919 deed. The 1921 chattel mortgage itself provided that when "said note" and interest including all renewals "are fully paid," then the chattel mortgage was to be void. Although the singular "note" is used, it was evidently intended that both notes were to be included in the provision, especially in the light of the employment of the plural verb "are". It is also conceded that the two first lien notes secured by the 1923 mortgage covered all the notes set out in the 1919 deed and the 1921 chattel mortgage. Were these 1923 notes taken in lieu of, in full satisfaction of, and in substitution of the 1919 and 1921 notes? The 1923 mortgage says they were. It recites that "the indebtedness hereby created is for the purpose of taking the place of the land notes now against the same land." And to show what was meant by this provision in the 1923 mortgage, there was indorsed on the margin of the deed book at the page where the 1919 deed was recorded the statement "all of the notes" set out in that deed "having now been fully paid, all liens are hereby released and fully discharged." This indorsement, coupled with the quoted provision in the 1923 mortgage, clearly indicates that the old notes were regarded as discharged and the new ones substituted in their place. Not only so, but the parties did not content themselves with saying in their indorsement on the margin of the deed book that the "lien herein or hereby retained is hereby released," but went much further and said that "all liens are hereby released and discharged." Manifestly this would include the lien of the 1921 chattel mortgage, at least in so far as it expressly secured the note mentioned in the 1919 deed. Further, the terms of the 1921 chattel mortgage that it was to be void if the notes secured by it were paid, coupled with the recital on the margin of the recorded 1919 deed that all the notes therein mentioned were paid, would release the lien of the 1921 chattel mortgage at least so far as it expressly secured the note mentioned in the 1919 deed. So far as the other note secured by the 1921 chattel mortgage and representing, as is conceded, the unpaid interest on the 1919 notes, is concerned, it too was clearly intended to be discharged by the 1923 notes. It

is conceded that they not only included the 1919 notes and unpaid interest, but also the 1921 note, itself representing unpaid interest. The conduct of the parties, what they said in their contracts, and what they did in releasing "all liens" on the margin of the 1919 recorded deed, lead inevitably to the conclusion that the 1923 notes were intended to be substituted for all that had gone before and so worked a novation. The failure to release the 1921 chattel mortgage was either an oversight or thought unnecessary in view of the terms of the chattel mortgage providing when it should be void coupled with the indorsement on the margin of the recorded 1919 deed. The parties never attempted to enforce the 1921 chattel mortgage until this claim was made after Watts' death. Their contracts and conduct establish a novation, and the trial court erred in holding that the 1921 chattel mortgage had not been released; the debts it secured having been discharged by the 1923 notes and mortgage.

Secondly, with reference to the claim of the holders of the 1923 first lien mortgage notes to the proceeds of the tobacco crop grown and pitched in 1930 and before Watts' death on the land covered by the 1923 mortgage: The claim to these proceeds is based on the pledge of "the rents, issues, and profits" appearing in the mortgage of 1923. How shall such a pledge be construed and applied?

Under the old English law, a mortgage on real property conveyed to the mortgagee the legal title to the property and placed him in the possession thereof unless the mortgagor reserved that possession. In the latter state of case, Lord Hardwicke, in the case of Higgins v. York Building Company, 2 Atkin, 107, said:

"In the case of a mortgage where a mortgagor is left in possession, upon a bill brought by the mortgagee for an account in this court, he can never have an account of rents and profits from the mortgagor for any of the years back during the possession of the mortgagor."

This rule was based on the proposition that generally the rents and profits follow the possession and so as long as the mortgagor held possession, he was not, as a general rule, liable for the rents and profits accruing during his possession. Meade v. Lord Orrery, 3

Atkin, 236; Jones on Mortgages, 667. However, where the mortgagor did not reserve possession and it passed to the mortgagee, the latter, of course, received the rents and profits which followed that possession. Where the mortgagor did reserve possession but defaulted in the conditions of the mortgage, the remedy of the mortgagee was by a writ of ejectment or writ of entry. When he had acquired in this fashion the possession, the mortgagee was thereafter entitled to the rents and profits though he could not make the mortgagor account for the past or bygone rents and profits. 4 Kent's Com. 165. The hardships that resulted from the legal theory of the mortgage entertained by the courts of law soon led the courts of equity to alleviate it by throwing various restrictions about the exercise by the mortgagee of his legal rights. The English courts of equity, while recognizing the legal theory of the mortgage, gave to the mortgagor certain equitable rights and imposed certain duties enforceable in equity on the mortgagee. In Pomeroy (Equity Jurisdiction, 4th Ed., 1184), in speaking of the English system, we find this:

"While equity has carefully built up its own theory so different in all points from that prevailing at law, it has never attempted to interfere directly with the legal doctrine. The two theories stood side by side each determined by its own tribunals as though the other had no existence."

The English legal rule never obtained in Kentucky. In the early days of our jurisprudence, the English equity rule was in vogue. Redman v. Sanders, 2 Dana, 68; Castleman v. Belt, 2 B. Mon. 157. In this last case, speaking to the question of the right of the mortgagee to rents and profits, this court said:

"Whether the mortgagor be in possession personally or representatively, the appropriate remedy of the mortgagee for obtaining a legal right to the profits, is by eviction or entry or other notice of his claim thereto, or by express contract therefor. Until such entry or demand, or eviction, actual or virtual, the law will not imply an assumpsit to pay him for the use and occupation, either by the mortgagor or the mortgagor's subsequent tenant, who had expressly agreed to pay rent to his lessor."

At law, the mortgagee who had no specific pledge of the rents and profits of the mortgaged premises

could not claim them as a legal incident to or a legal right growing out of his mortgage. See Douglass v. Cline, 12 Bush, 608. But even before the adoption of our first Civil Code of Practice carrying with it section 329, now section 299 of the present Civil Code of Practice, courts of equity had adopted in suits to foreclose mortgages the rule of appointing a receiver to collect the rents and profits accruing after' the date of his appointment and to apply them to the mortgage debt when it was made to appear that the mortgaged property was probably insufficient to discharge the mortgage debt. Douglass v. Cline, supra. Thus section 299 of the present Code of Civil Practice, being section 329 of the first Code of Civil Practice, which reads, "In an action by a mortgagee for the sale of the mortgaged property, a receiver may be appointed, if it appear that the property is in danger of being lost, removed or materially injured or, that the condition of the mortgage has not been performed, and that the property is probably insufficient to discharge the mortgage debt," is but a legislative declaration of a pre-existing equitable right as pointed out in the Douglass v. Cline Case, supra. Shortly after the adoption of our Code of Civil Practice in the fifties, the theory that a mortgage placed the legal title to the real estate in the mortgagee was gradually relaxed and what is now known as the "equitable rule" was adopted. That theory is now in force. It is that a mortgage creates only a lien on the real estate in favor of the mortgagee, the legal title being left in the mortgagor. As said in Woolley v. Holt, 14 Bush, 788:

"Under the late decisions of this court, the following propositions may be considered as established law:

"First, that a mortgage is a mere security for debt, and that, substantially, both at law and in equity, the mortgagor is the real owner of the property mortgaged. Second, that the rents can be claimed by the mortgagee only by virtue of his contract with the mortgagor, and that they are not an incident, as between mortgagor and mortgagee, to a mortgage pledging the property by metes and bounds and making no reference to the rents, except as hereinafter indicated. Third, when there are no intervening equities of other parties the

court may, on it appearing that the mortgaged property is in danger of being lost, removed, or materially injured, or that the condition of the mortgage has not been performed, and that the property is probably insufficient to discharge the mortgage-debt, appoint a receiver and subject the subsequently-accruing rents or profits to the satisfaction of the mortgagee's claim. Fourth, where another than the mortgagee has acquired a legal or equitable interest·in or title to the rents or profits, prior to the appointment of a receiver, as provided in section 299 of. the Civil Code, the mortgagee's claim to such rents or profits will be postponed to that of the intervening claimant.''

We thus see that there has gradually evolved in our jurisprudence the lien theory of a mortgage and along with this development of that theory there has emerged two separate and distinct ways whereby a mortgagee of real estate may have the rents, issues, and profits of mortgaged realty applied towards the satisfaction of the mortgage debt: First, the equitable right now embodied in the Code right, and, secondly, the contract right. In reading the cases and in applying their principles, it is necessary to keep the distinction between the Code or equitable right and the contract right in mind. The Woolley Case, supra, presents the problem of the enforcement of the Code right. There the mortgage did not pledge the rents and profits. Prior to the execution of the mortgage, the mortgagor had placed a ten-year lease on the premises. After the execution of the mortgage, he sold and transferred his rights under the lease to Woolley. After a foreclosure of the mortgage, the property not bringing enough to satisfy the mortgage debt, the question arose as to whether the mortgagee or Woolley was entitled to the rents. The court, in applying the principles quoted above and in holding that Woolley was entitled to the rents, said:

"The mortgagee's claim to the rents is inchoate, and its perfection dependent upon the happening of the contingency provided for in section 299 of the Civil Code. In the case under consideration no claim to the rents was asserted by appellee, no application was made for a receiver and none appointed until after Johnston, for a valuable

consideration, had sold and transferred his interest in the lease to appellant, nor until some time after Borden had attorned to appellant.

"In the absence of an express pledge of the rents to appellee his right to them is at best but an equity, only to be enforced in the manner and under the circumstances indicated by the section of the Code referred to, and not then if another has acquired, for a consideration, a claim to the rents. It was in the power of appellee to take a lien upon the term, as well as upon the reversion, to secure his debt, and his failure to do so by the express terms of his contract or to take the steps provided for perfecting his equity by the appointment of a receiver until after Johnston had sold to appellee, leaves him without remedy, so far as subjecting the rents are concerned.

"We are of the opinion that Douglass v. Cline, 12 Bush, 608, is conclusive of the principal point suggested in this case, and therefore deem it unnecessary to cite further authority."

Thus we see that the cases arising under the application of section 299 of our Civil Code of Practice do not materially help to solve the problem before us, for here we have involved the question of a contract right to the rents, issues, and profits. Accordingly, we may at once lay aside such cases as Georgetown Water Co. v. Fidelity Trust Co., 117 Ky. 325, 78 S. W. 113, 25 Ky. Law Rep. 1739, Huston, Johnson & Co. v. T. J. Strow, 8 Ky. Op. 603; and Mortgage Union of Penn v. King, 245 Ky. 691, 54 S. W. (2d) 49, where the Code right as distinguished from the contract right was involved. When we turn to discuss what are the rights of a mortgagee under a contract right to the rents, issues, and profits, we must at least in reading the cases from foreign jurisdictions note a distinction between the state of case where the mortgage carries only a pledge of the rents, issues, and profits, and where it carries along with such a pledge a provision to the effect that upon default by the mortgagor of any of the provisions of the mortgage, the mortgagee or trustee of the mortgage may take possession of the mortgaged property through himself or through a receiver appointed by the court on application of the mortgagee or trustee and receive the

rents and profits then due or to become due and apply them towards the payment of the mortgage debt. In the last state of case, the courts construe the pledge of the rents and profits and the right to take possession together and hold that the rents and profits pledged are those which accrue after the mortgagee or receiver takes charge or which are due at that time and as to which no intervening equity has attached. Thus in the case of Freedman's Sav. & Trust Co. v. Shepherd, 127 U. S. 494, 8 S. Ct. 1250, 1254, 32 L. Ed. 163, it is said:

"It is, of course, competent for the parties to provide in the mortgage for the payment of rents and profits to the mortgagee, even while the mortgagor remains in possession. But when the mortgage contains no such provision, and even where the income is expressly pledged as security for the mortgage debt, with the right in the mortgagee to take possession upon failure of the mortgagor to perform the conditions of the mortgage, the general rule is that the mortgagee is not entitled to the rents and profits of the mortgaged premises until he takes actual possession, or until possession is taken in his behalf by a receiver. * * * Even if the deed had expressly pledged the income as security for the debts named, the mortgagor, according to the doctrines of the cases cited, would have been entitled to the income, until, at least, possession was demanded under the deed; or until his possession was disturbed by a sale under the deed of trust; or, in advance of a sale, by having a receiver appointed for the benefit of the mortgagee."

It is probably to this class of cases that the case of Douglass v. Cline belongs. We still have left the state of case where along with the mortgage of the land, the mortgage puts in lien also the rents, issues, and profits, without the provision as to the right to a receiver on default. It is in this category that the instant case falls. In foreign jurisdictions, the great weight of authority is to the effect that a mortgage conveying lands together with the rents, issues, and profits is a lien upon the lands only, the words adding nothing to the security of the mortgage debt, and meaning nothing more than the law allows, that is, the rents, after default upon the mortgagee taking possession. Those cases point out that to entitle the mortgagee to rents

accruing before default, there must be an express pledge to that effect. See Myers v. Brown, 92 N. J. Eq. 348, 112 A. 844, affirmed 93 N. J. Eq. 196, 115 A. 926; Smith v. Cushatt et al., 199 Iowa, 690, 202 N. W. 548; One Hundred Forty-Eighth Street Realty Co. v. Conrad, 125 Misc. 142, 210 N. Y. S. 400; and see Grether v. Nick, 193 Wis. 503, 213 N. W. 304, 215 N. W. 571, 55 A. L. R. 525. Thus in 41 C. J. 628, it is written:

"It is competent for the parties to agree that the rents shall be collected by the mortgagee or a trustee and applied in reduction of the debt secured by the mortgage, and the mortgage may be so drawn as to pledge the rents and profits specifically as security, in which case they become, equally with the land, a primary security, and mortgages also frequently contain clauses assigning the rents to the mortgagee. Unless acted upon by the parties such provisions do not become effective, however, until the mortgagee actually obtains possession, or until he asserts his rights by securing the appointment of a receiver or impounding the rents and profits pending foreclosure, or taking some action equivalent thereto. In some jurisdictions, the rule obtains that a demand is sufficient to make effective the rights of the mortgagee to the rents and profits covered by the mortgage."

In the footnotes are collected the authorities in support of the text.

Do the Kentucky cases support this rule obtaining in foreign jurisdictions? The first case bearing on this proposition to which our attention has been called is that of Newport & Cincinnati Bridge Co. v. Douglass, 12 Bush, 673. In that case, one of the mortgages involved pledged the rents, issues, and profits. The others do not seem to have done so, though they did provide that on default the mortgagee or trustee could take possession and thereafter appropriate the rents, issues, and profits towards the extinguishment of the mortgage debts. On default, application was made for a receiver and one was appointed who thereafter collected rents, issues, and profits. Unsecured creditors attached these funds in the hands of the receiver, but it was held that their claims to the funds in the hands of the receiver were subordinate to the claims of the mortgagees to such funds.

The next case is that of Bank of Louisville v. Baumeister, 87 Ky. 6, 7 S. W. 170, 173, 9 Ky. Law Rep. 845. To somewhat simplify the facts of that case as one of the able amicorum curiæ has done, it appears that in that case there were four mortgages on the same realty. The first three did not pledge the rents, issues, and profits, but the fourth one did. In the foreclosure of all these mortgages, the fourth mortgagee asked that there be applied towards his mortgage debt the rents accrued and accruing during the pendency of the action. The lower court held that the fourth mortgagee was entitled to such rents accrued and accruing over the three prior mortgagees. In affirming that holding, this court said:

> "Though excepted to at the time, counsel do not in argument insist upon a reversal upon the ground Baumeister was adjudged to have a prior lien upon the rents; nor do we think there was error on that account, for neither of the other mortgages in terms operated upon or related to the rents, as was the case of the mortgage to Baumeister, and consequently neither of them created a lien upon anything besides the property mortgaged."

The next case is that of Handman v. Volk, 99 S. W. 660, 30 Ky. Law Rep. 818. There the mortgage carried a pledge of the rents, issues, and profits. On default, the mortgagee prayed that a receiver be put in charge of the premises to collect the rents, issues, and profits (obviously those thereafter accruing) and apply them towards the mortgage debt. His right to do so was upheld.

The next case is that of Brasfield & Son v. Northwestern Mutual Life Insurance Co., 233 Ky. 94, 25 S. W. (2d) 72, 73. The mortgage in that case pledged the rents and profits and also contained a provision authorizing the mortgagee to apply for a receiver in the event of a default of any conditions of the mortgage. Default having occurred, the mortgagees brought suit to enforce the mortgage lien and for the appointment of a receiver. After the suit had been brought and the motion for a receiver had been made, the Hickman Bank & Trust Company and the Farmers' & Merchants' Bank took a chattel mortgage on the crops then growing on the land. The controversy was whether or not the banks were entitled to these crops under their chat-

tel mortgage or the mortgagee by virtue of the clause in his mortgage pledging the rents, issues, and profits, coupled with his application for a receiver. The court, holding that the mortgagee was entitled to these crops, said:

> "Inasmuch as appellee's mortgage was of record, and the banks did not take the chattel mortgage on the crops until after suit was brought and they had been made parties to the action, and the motion for a receiver had been made, they took with notice, and the lien they acquired by the chattel mortgage was inferior to the lien of appellee."

The last case is that of Northwestern Mutual Life Insurance Co. v. Stofer, 242 Ky. 144, 45 S. W. (2d) 1025. In that case the mortgage pledged the rents, issues, and profits with a clause authorizing the mortgagee on default to make application for the appointment of a receiver. Default having occurred, the mortgagee brought suit to foreclose the mortgage and asked for a receiver to take charge of the crops which had been grown during the year and which at that time had been pitched. It appeared that before suit had been brought the mortgagor had executed a chattel mortgage on these crops to the United States of America. In holding that the mortgagee was entitled to have a receiver appointed to take charge of these crops, this court said that the mortgagee *at least* had a lien on the crops in question subject to the rights of the United States under its mortgage, and that on final hearing the trial court could divide the proceeds of these crops between the mortgagee and the United States as their interests might appear; the court expressing no opinion as to the priority of the liens.

From this review of the Kentucky cases, it thus appears that where there is a pledge of the rents, issues, and profits, the mortgagee is entitled: First, to subject by proper proceedings all rents, issues, and profits accruing thereafter. This right to the after accruing rents, issues, and profits is superior to the rights of any others to such after accruing rents, issues, and profits who acquired their rights with notice actual or constructive of the mortgagee's rights to such rents, issues, and profits. To this extent, the Kentucky cases are, of course, in accord with the cases above noted from for-

eign jurisdictions. Secondly, the mortgagee is entitled to the rents, issues, and profits accrued or on hand with the mortgagor at the time the mortgagee seeks to subject them to his mortgage, *at least* if liens, voluntary or involuntary, in favor of third parties in and to such accrued rents, issues, and profits or those on hand have not come into existence prior to the time the mortgagee seeks to subject such accrued rents, issues, and profits to his mortgage. What the rights of the mortgagee may be in the absence of such condition does not seem to have been expressly decided in any of the cases discussed, and, indeed, seems to have been left open in the Stofer Case, supra. Nor need we decide that question in the instant case, because the contest here is between the mortgagee and the unsecured creditors of Watts. Had the mortgagees in the instant case undertaken just before Watts' death to subject these crops which Watts had grown and pitched on his farm and which are here in question, they would under the cases supra have prevailed over Watts' unsecured creditors.

What effect did Watts' death and the appointment of an administrator prior to the mortgagees' effort to subject these crops to their debt have? The appointment of an administrator for Watts' estate, which of course included the crops, precluded thereafter an effort on the part of these mortgagees to have a receiver appointed. Home Mission Board of Southern Baptist Church v. Wylie's Ex'rs, 230 Ky. 284, 18 S. W. (2d) 1106. See also Evans' Adm'r v. Clinton Bank, 244 Ky. 270, 50 S. W. (2d) 563. As set out in those cases, the administrator has a right to take charge of the personal estate of the decedent for the purpose of administering it and distributing it according to law. In the event the administrator is acting improperly or is wasting that estate, the proper procedure is either to have him removed or to require him to execute additional bond. Such being the rule, the administrator in the instant case held this tobacco crop as well for the mortgagees as for the unsecured creditors of Watts. The mortgagees having made due application to have these crops which were on hand at the time of Watts' death and at the time of their application applied to their mortgage debt, they were, under the rules above set out, clearly entitled to such relief as against unsecured creditors. Therefore, in so far as the judgment of the lower court

632

awarded the proceeds of the tobacco crop to the holders, of the first lien 1923 mortgage notes, the judgment was clearly correct. Inasmuch as the reversal of that part of the judgment relating to the proceeds of the personalty once covered by the 1921 chattel mortgage will provide ample funds for whatever administrator's commission may be due the administrator herein, it will not be necessary to further discuss his right to have the proceeds of the tobacco crop subjected to his administrator's commission because as between such proceeds which are under lien and the proceeds of the other personalty which are free assets, the commission will have to go against the latter.

As to the proceeds of the tobacco crop, the judgment is affirmed. As to the proceeds of the other personalty, the judgment is reversed.

Whole court sitting.